# United States Court of Appeals
## For the First Circuit

No. 02-2571

UNITED STATES OF AMERICA,

Appellee,

v.

FRANKLYN LIRANZO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Boudin, Chief Judge,
Lynch, Circuit Judge,
Schwarzer,[*] Senior District Judge.

Dana A. Curhan for appellant.
Virginia M. Vander Jagt, Assistant United States Attorney,
with whom Michael J. Sullivan, United States Attorney, was on
brief, for appellee.

September 30, 2004

[*]Of the Northern District of California, sitting by
designation.

**LYNCH**, **Circuit Judge**.  Franklyn Liranzo was a passenger in a car stopped by Massachusetts state troopers in the fall of 2001.  A Llama .380 semi-automatic handgun was found underneath his seat.  The troopers arrested all four occupants and asked them to whom the gun belonged.  All four denied ownership.

After jury trial, Liranzo was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  He challenges his conviction on the grounds that 1) the evidence at trial was insufficient to establish Liranzo's constructive possession of the firearm, and so the trial judge improperly denied his motion for a judgment of acquittal, and 2) admission of testimony by the arresting officers about their assignments to a gang task force was prejudicial error.  We affirm.

## I.

We recount the facts with all reasonable inferences made in favor of the verdict.  See United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000).

In the fall of 2001, Massachusetts State Police Troopers Thomas McCarthy and Ernest Doherty, members of a police task force targeting gang activity, kept watch on the home of a known gang member on Farnham Street in Lawrence, Massachusetts.  On September 4, 2001, at approximately 10:40 PM, the troopers saw a green Nissan Maxima idling in front of the driveway of the residence.  Two people entered the Nissan and then, just as the troopers pulled

-2-

alongside the car, the Nissan quickly drove away with four occupants inside. Troopers McCarthy and Doherty followed the Nissan in an unmarked police car. They noticed that the Nissan's rear license plate was only hanging by a single screw, and they watched the Nissan go through an intersection with stop signs without coming to a complete stop. They informed Sergeant Francis Hughes, who was also in the general area in a separate unmarked police car, that they intended to stop the green Nissan for those violations. As McCarthy and Doherty caught up to the Nissan, they observed the three passengers looking out the back window of the car to watch the troopers' car.

The Nissan turned into Shawsheen Road, a well-lit road next to a deserted park. The troopers' cruiser followed. McCarthy activated the cruiser's emergency lights and the siren to get the Nissan to pull over. After both cars stopped, the officers got out of the car, but waited before they approached the Nissan. They observed the occupants of the car moving around and looking back at the troopers. Meanwhile, Hughes approached the stopped Nissan from the opposite direction on Shawsheen Road. As Hughes stopped his car to sandwich the Nissan between the two police cruisers, his headlights illuminated the inside of the Nissan.

Hughes got out of his cruiser with a flashlight and approached the Nissan from the front. Concerned that the driver of the Nissan might attempt to run him down with the car, he carefully

observed the two front occupants of the car and paid particular attention to their hands partly because "[h]ands are the things that can produce weapons." The driver and Liranzo, the front passenger, both were looking through the rear window in the direction from which McCarthy and Doherty would be approaching. They did not move around inside the car and there was no indication that Liranzo knew Hughes was approaching from the front.

When Hughes was about eight feet from the Nissan, he shined his flashlight into the interior of the car. At that moment, Liranzo's head "snapped" around, his eyes widened, and he made direct eye contact with Hughes for the first time. Hughes testified:

> As soon as [Liranzo] made eye contact with me, I observed his front upper torso move forward. At this point, his right shoulder was slightly cocked back. At this point, the front of his body came forward, his right shoulder came forward, his head lowered and he made a reaching movement underneath the seat. His head was now slightly below the dashboard. I could still see his eyes.

Liranzo's movement was "of great concern" to Hughes because "[b]ased on [his] training and [his] experience in car stops, that movement was consistent with a movement where [Liranzo] was either reaching for something, to grab something or either get rid of something."

In response to Liranzo's movement, Hughes yelled "at the top of [his] lungs" for Liranzo and the other occupants of the car

-4-

to raise their hands.  Liranzo and the three others complied and raised their hands.

As the three officers approached the car, they smelled burnt marijuana.  Officer Doherty also saw several open beer bottles.  Of the four men in the car, only Liranzo protested the stop and demanded to know why they had been pulled over.

The officers conducted pat-frisks of the occupants for weapons and contraband.  Marijuana was found in the pocket of one of the occupants (not Liranzo).  Hughes immediately went back to the front passenger seat of the car to search the area into which Liranzo had been reaching.  He found a Llama .380 semi-automatic handgun containing one bullet.  The gun was propped up between the seat and the floor at a 45-degree angle, leaning on a hump of carpet and partly on the undercarriage of the front seat.

On October 21, 2001, a grand jury indicted Franklyn Liranzo with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).[1]  During his jury trial, Liranzo's defense focused on attacking the credibility of and procedures used by the arresting officers.  He did not testify. The jury found him guilty.  Liranzo was sentenced to 108 months imprisonment, a three-year term of supervised release, and a

_____

[1] "It shall be unlawful for any person ... who has been convicted in any court of, a crime punishable by imprisonment  for a term exceeding one year ... to ... possess in or affecting commerce, any firearm or ammunition."  18 U.S.C. 922(g)(1).

special assessment of $100.  Judgment was entered on November 25, 2002, and the defendant timely appealed.

## II.

Liranzo argues that there was insufficient evidence to prove beyond a reasonable doubt his constructive possession of the handgun.[2]  Constructive possession for § 922(g) purposes does not require ownership of the gun.  See United States v. Meade, 110 F.3d 190, 202 (1st Cir. 1997).  The evidence was sufficient.

First, Liranzo argues that in order to meet the burden, the government must foreclose all reasonable alternative hypotheses inconsistent with Liranzo's possession of the firearm.  On the facts, Liranzo posits that the evidence is consistent with multiple theories: the gun could have been put there by one of the passengers in the rear seat, or by the driver of the car, or even have been left there before the car stopped.  While Liranzo's movement could have been a move to hide the gun, he argues that he could also have been "attempting to retrieve the registration from

---

[2] Section 922(g)(1) requires the government to prove that the defendant was a convicted felon who knowingly possessed a firearm in or affecting interstate commerce. United States v. Wight, 968 F.2d 1393, 1397 (1st Cir. 1992).  Knowing possession under § 922(g)(1) may be  proved through actual or constructive possession of the firearm.  Id. at 1398.  Since Liranzo stipulated at trial that he was a convicted felon and assumes, for purposes of the present appeal, that the firearm in question traveled in interstate commerce at some point, he is only challenging the sufficiency of the evidence with respect to the element of constructive possession.

the glove box, tying his shoe, scratching his leg, or any one of a number of innocent behaviors."

This argument fails. As an initial matter, the legal theory is incorrect: "[T]he government need not present evidence that precludes every reasonable hypothesis inconsistent with guilt in order to sustain a conviction. Rather, the jury is at liberty to select freely among a variety of reasonable alternative constructions of the evidence." United States v. Loder, 23 F.3d 586, 590 (1st Cir. 1994) (citations omitted). The reviewing court "must uphold any verdict that is 'supported by a plausible rendition of the record.'" Hernández, 218 F.3d at 64 (quoting United States v. Ortiz, 966 F.2d 707, 711 (1st Cir.1992)).

The evidence is sufficient to establish Liranzo's constructive possession of the gun. The precarious, angled position in which the gun was found negated any inference that the gun was placed there before the Nissan came to a complete stop. As officer Hughes testified, "[T]here is no way that gun would have stayed in that location if the car was moving." Based on the weight of the gun, its unusual 45-degree angle, and the fact that it was "supported almost by the three prongs of the handgun against the carpet," Hughes concluded that "the gun would have slid out if the car was moving." Hughes also testified that he did not observe any movements from the driver of the Nissan as he approached the car from the front, negating any inference that the driver placed

the gun underneath Liranzo's seat. As for the possibility that the gun was placed there by the passengers in the back, Hughes testified that it would have been impossible for someone in the backseat to press the gun into that position due to the "small bowl [formed by the raised carpet] directly underneath the seat" and the wires and other pieces of the undercarriage that were in the way. Hughes noted, "[T]here is no way the gun would have made it over that hump and still have been balanced on the undercarriage like that from the back. It just couldn't have happened." The possibility that Liranzo's reaching movement was to tie his shoe or to get his registration cannot be squared with the testimony that Liranzo maintained eye contact with Hughes throughout the entire sequence of his movements.

It is not the role of the reviewing court to "weigh the evidence; [our role is] merely to ensure that some evidence exists to support sufficiently the jury's determination." United States v. Nieves-Burgos, 62 F.3d 431, 438 (1st Cir. 1995). Since the jury heard evidence that the gun must have been placed in its final position after the Nissan came to a complete stop, and that none of the other occupants in the car could have put it there, the jury could have inferred that Liranzo's reaching movement was not innocent, but a move to put the gun under the seat.

Liranzo also correctly notes that "mere proximity to a weapon is not sufficient to show actual or constructive

-8-

possession." United States v. Weems, 322 F.3d 18, 24 (1st Cir. 2003). In support of his argument he should have been acquitted because nothing more than "mere proximity" was shown here, Liranzo cites a set of cases from other circuits whose facts are easily distinguishable. See, e.g., United States v. Soto, 779 F.2d 558, 560-61 (9th Cir. 1986), opinion amended by 793 F.2d 217 (9th Cir. 1986) (insufficient evidence to establish possession where weapons were found in the van in which defendant was a passenger for only 10 minutes, the weapons were accessible by defendant as well as the driver and another passenger, driver testified that he owned the weapons and that defendant did not know about them before getting in the van, and government presented no other evidence that defendant was connected to the weapons); United States v. Blue, 957 F.2d 106 (4th Cir. 1992) (insufficient evidence to establish constructive possession where government's only evidence was that police officer testified that he saw defendant's shoulder dip as he approached vehicle and weapon was found under his seat, but no fingerprints or other evidence linking defendant with gun were produced). Liranzo also points out a host of supposed lacunae in the evidentiary record: there was no evidence that he was the registered owner of the car or its driver; there was no physical evidence such as fingerprints; there was no evidence that the defendant had ever been seen with the weapon or any weapon at all.

There was much more than "mere proximity" here.  As the earlier discussion demonstrates, the evidence showed that Liranzo exercised exclusive dominion and control over the location of the gun.  See United States v. Zavala-Maldonado, 23 F.3d 4, 7 (1st Cir. 1994) ("'Constructive' possession is commonly defined as the power and intention to exercise control, or dominion and control, over an object not in one's 'actual' possession.").  This renders the "no other evidence" argument irrelevant.  The fact that the government did not present certain kinds of evidence does not mean that there was insufficient evidence for conviction.  In our review, we look at "the total evidence, with all reasonable inferences made in the light most favorable to the government."  Hernández, 218 F.3d at 64 (emphasis added) (quoting Loder, 23 F.3d at 590).

### III.

Liranzo also argues that the trial court erred by allowing the arresting officers to testify about their assignments in the gang task force, thereby causing prejudice to Liranzo.  There was no error.

Liranzo moved in limine before trial to exclude references to the terms "gang" and "gang unit" from the officers' testimony.  The trial judge denied the motion after a hearing.  Since Liranzo had indicated that his defense would attack the credibility of the arresting officers and the police practices and procedures used in this case, the trial judge concluded that

evidence of the officers' assignments to the gang task force was relevant to explain to the jury the appearance of "excessive police presence for people who essentially have traffic stops." Furthermore, the judge explained that the jury could perceive this car stop as an incident of racial profiling. The judge held the evidence was relevant so the government could demonstrate that "these people weren't stopped because of their race, but because these officers are there for the particular responsibility ... [of] watching the house [of the known gang member on Farnham Street]."

The government told the jury in its opening statement that "this case is nothing about gangs" and that "[t]he only importance of what [the officers] were doing and where they were is for you to understand that this was not a [routine] car stop." Before any of the officers testified, the trial judge gave the following limiting instruction to the jury:

> I am allowing these officers to testify as to their duties, because those were their duties according to them, and so ... this testimony about what their assignment was at the time of the incident in question is given solely to provide to you background and context.
> The government does not claim in this case that the defendant is in a gang or that he was involved in any gang activities at the time of the event in question in this case. And so for that reason, the fact that witnesses may testify they were members of the gang task force and/or that they were investigating gang related activities has no bearing on whether you find the defendant guilty or not guilty of the offense with which he has been charged.

During trial, the officers testified that they were assigned to the "Suffolk County Gang Unit," whose responsibility is to "investigate gang-related crimes." They "patrol the greater Lawrence area to seek out gang-related issues, gang-related crime." The officers paid particular attention to the Farnham Street house because it was the house of a "known gang member of the outlaw gang ... based out of South Lawrence." They drive by that area "at least twice, maybe three times a week, normal patrol" and during the last five years have "gone by, driven by, and observed [the] activity of ... the residence[] ... probably a couple hundred times." During trial, Liranzo lodged repeated objections to such references to the officers' assignments and activities at the Farnham Street home and thus preserved his objections for appeal.

Liranzo contends on appeal that all evidence regarding the officers' posts in the police gang task force and the gang activity at the home on Farnham Street should have been excluded as irrelevant and prejudicial to Liranzo. Specifically, Liranzo argues that admission of the evidence was error because 1) the evidence failed to establish that he was in a gang, 2) any alleged gang affiliation had no bearing on his case, and 3) the admission of the evidence prejudiced his defense and changed the outcome of a close case.

Our review is for abuse of discretion. Under Federal Rule of Evidence 403, relevant "evidence may be excluded if its

-12-

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  The process of balancing the probative value of evidence with the risk of unfair prejudice is committed to the sound discretion of the trial court.   United States v. Fields, 871 F.2d 188, 196 (1st Cir. 1989).  "[O]nly in 'extraordinarily compelling circumstances' will we reverse a district court's 'on-the-spot judgment' concerning the probative value and unfair effect of the proffered evidence." United States v. Shea, 159 F.3d 37, 40 (1st Cir. 1998) (quoting United States v. Lewis, 40 F.3d 1325, 1339 (1st Cir. 1994)).  This standard is not met here.

Liranzo's first argument fails because the evidence was not admitted to show his gang membership and the limiting instruction made that clear.

Second, the evidence regarding the gang task force and the surveillance of the Farnham Street home was, for the reasons stated by the trial judge, relevant.

Furthermore, the district court's concern for the risk of the jury's perception of racial profiling was validated by what occurred before and at trial.  Much of the voir dire questioning focused on potential juror bias against the defendant as a "black Hispanic" man.  The voir dire thus caused the jury to be extra sensitive to the race of the defendant and led to one prospective juror telling the trial judge, "I am not comfortable with a11 of my

-13-

white peers judging a black person." The opening statement of the defendant stressed that all of the occupants of the Nissan were Hispanic and that the stop occurred in "a Hispanic neighborhood with many other Hispanic people." The trial judge thus had reason to believe that the testimony regarding the officers' gang-related assignments and the surveillance history of Farnham Street would be relevant in giving the jury the necessary background to understand the police procedures and their reactions so as to counter any impression of racial profiling.

Finally, any risk of unfair prejudice is limited by the court's instructions to the jury and the government's explanation of the role played by the officers' testimony. See United States v. Taylor, 284 F.3d 95, 104 (1st Cir. 2002) (district court's cautionary instruction to jury that "Defendants are not charged with possessing a firearm or a gun" addressed any risk of unwarranted inferences by jury from evidence that defendant possessed a gun); Shea, 159 F.3d at 40 (1st Cir. 1998) (district court's cautionary limiting instruction to jury minimized potential prejudice to defendant from admission of a gun used in a separate robbery and such admission was not abuse of discretion).

## IV.

For the foregoing reasons, we **affirm** Liranzo's conviction for being a felon in possession of a firearm. So ordered.