UNITED STATES of America, Plaintiff,

v.

Joel CEDEÑO–MARIANO, Defendants.

Criminal No. 13–173 (FAB).

United States District Court, D. Puerto Rico.

Sept. 23, 2013.

Kelley L. Tiffany, San Juan, PR, for Plaintiffs.

Raymond Rivera–Esteves, Juan Hernandez Rivera & Assoc., San Juan, PR, for Defendants.

## OPINION AND ORDER

BESOSA, District Judge.

On April 3, 2013, a grand jury returned an indictment charging defendant Joel Cedeño–Mariano ("Cedeño") with one count of being an illegal alien in possession of ammunition, in violation of Title 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2). (Docket

15.) A three-day jury trial commenced on June 12, 2013; at the close of the government's case on June 13, 2013, defendant Cedeño moved for acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"). The Court denied defendant's motion; at the close of all the evidence on June 14, 2013, defendant Cedeño renewed his motion, which the Court again denied. On that same date, a jury found defendant Cedeño guilty of Count One of the indictment. (Docket 67.)

On June 28, 2013, defendant Cedeño filed a motion pursuant to Rule 29(c)(2) to set aside the verdict and enter judgment of acquittal. (Docket 74.) The government responded on September 5, 2013. (Docket 76.) For the reasons discussed below, the Court **DENIES** the defendant's motion and **SUSTAINS** the jury verdict.

## BACKGROUND

### I. Factual History

Without rehashing the entire trial here, the Court recounts background information and facts relevant to the Court's legal analysis of particular issues. *See United States v. Stierhoff,* 549 F.3d 19, 21 (1st Cir.2008). The Court conveys the facts throughout the opinion in the light most favorable to the verdict. *United States v. Rodriguez–Marrero,* 390 F.3d 1, 6 (1st Cir. 2004).

On March 24, 2013, while patrolling the waters to the east and southeast of Puerto Rico, Mr. Jose Garay—a pilot for the U.S. Customs and Border Protection ("CBP") Air and Marine Division—and other maritime agents on board Pilot Garay's aircraft noticed a small boat ("yola")[1] approximately 4.5 to 5 miles from Puerto Rico's

---

1. A marine interdiction agent for CBP defined a "yola" as a commercial fishing vessel that is about 20 feet long and has a single engine in the back. (Transcript of Trial on June 13, 2013 ("Day 2") at p. 40.)

coast. (Day 2 at pp. 2–6, 40.) Using the aircraft maritime radar, Pilot Garay was able to observe the yola's occupants and contents. *Id.* at 6–7. The CBP agents on the aircraft took particular interest in the yola because they noticed that although the yola was located in waters known to be a fishing area, the three individuals on board were not engaged in fishing and had no fishing equipment or gear in the yola. *Id.* at 7–8, 33–34. Instead, Pilot Garay noticed "[e]xcessive amounts of packages inside the vessel." *Id.* at 8.

The aircraft climbed to a higher altitude so that the CBP agents could covertly surveil the yola and discern the individuals' behavior and direction of travel. (Day 2 at p. 8.) Pilot Garay testified that he observed the yola making occasional southeastern and eastern movements in the water, which carried them in the direction of St. Croix—the nearest island southeast from Puerto Rico. *Id.* at 21. He also testified that the yola came to a complete rest in the ocean at one point without dropping an anchor, placing fishing buoys in the water, throwing any nets into the water, or engaging in any other type of fishing or recreational activity. *Id.* at 24, 26–27, 33. Upon observing the yola "moving erratically [with] no predetermined course," Pilot Garay concluded that instead of "traveling from point A to point B, [they were] waiting for something or just loitering there." *Id.* at 8–9. Subsequently, the CBP agents called the CBP Marine Interdiction Unit in Humacao, Puerto Rico ("Marine Unit") to notify them of the yola and request that they take a closer look at it. *Id.* at 9.

CBP marine interdiction agent Eric A. Duff was patrolling the waterways of southeastern Puerto Rico when his Marine Unit received Pilot Garay's call regarding the yola. He received information that the yola was "dead in the water" at that time, and "that [it] had white packages on board with three people on board." (Day 2 pp. 39–40.) Agent Duff located the yola approximately five nautical miles southeast of the island of Puerto Rico; he testified that it took the Marine Unit somewhere between 15 and 30 minutes to reach the yola. *Id.* at 40. When the Marine Unit's boat was approximately one mile away from encountering the yola, the yola started to move in a southeasterly direction. *Id.* At about one hundred feet away from the yola, Agent Duff turned on the Marine Unit boat's siren and flashing blue law enforcement lights to signal the yola. *Id.* at 41. The three passengers in the yola acknowledged the Marine Unit by turning to look at the Marine Unit and by subsequently slowing the yola's speed. *Id.* They then turned the yola 180 degrees, pointed its bow directly at the Marine Unit's boat, and accelerated towards it. *Id.* Agent Duff testified that about 15 to 20 feet before the yola rammed the Marine Unit's boat, one of the three individuals who was in the front of the yola threw an object at the Marine Unit's boat that sank into the ocean. *Id.* He testified that the object was a dark, handheld object that appeared to be in a clear plastic bag, "like a Ziploc bag," and that the object actually hit the Marine Unit's boat "with a big thud" before falling into the water, never to be seen again.[2] *Id.* at 41–42. Subsequent testimony by Agent Jason Hay corroborat-

---

**2.** Agent Duff testified that he was able to see the man throw the dark, handheld object into the ocean because he anticipated that the yola was going to hit the Marine Unit's boat. (Day 2 at p. 42.) He was concerned with the front of the yola, therefore, "and was looking di-

rectly at the person standing on the front of the boat" right before impact. *Id.* He admitted, however, that he was not able to make out the exact object that the person threw into the water. *Id.*

ed this occurrence; although his focus was on the other individuals' hands in the yola, he claims to have seen an object fly out of his field of vision and believes that it fell into the ocean. *Id.* at 63. The yola continued to accelerate towards the Marine Unit's boat, and shortly thereafter the front of the yola struck the left side of the Marine Unit's boat, creating a 6 to 8–foot long gouge down the side of the boat. *Id.* at 42. Agent Duff testified that he believed that the yola rammed into the Marine Unit's boat on purpose because "they accelerated into us." *Id.* at 50. The yola then continued alongside the Marine Unit's boat, past the stern until it was actually behind the boat, where it eventually stopped. *Id.* at 43. Agent Duff then maneuvered the Marine Unit's boat and came up behind the yola so that the Marine Unit's "boarding team" could board the yola. *Id.*

The boarding team consisted of marine interdiction agents Jason Hay and Eric Faria. They initially boarded the yola to investigate potential U.S. customs violations, immigration violations, and terrorist violations. (Day 2 at p. 66.) Testimony of Agent Hay revealed that there was so much fuel (*see* note 3, *infra.*) in the yola that the extra weight from the agents' presence on board caused the yola to begin to "take on" ocean water. *Id.* at 67. Due to risk of sinking, the boarding team secured the three people on the yola and moved everybody from the yola to the Marine Unit's boat. *Id.* At that time, they were not able to conduct an investigatory examination of the yola. *Id.* While on board the Marine Unit's boat, the boarding team asked the three individuals several

questions: whether they had any weapons, what their nationalities were, where they came from, where they were going, and if they had large amounts of monetary instruments. *Id.* at 69. The three individuals initially told the boarding team that they were coming from the Dominican Republic, and that they were going back to the Dominican Republic. *Id.* at 70. Defendant Cedeño stated that he did not have any documentation to allow him to be in the United States lawfully; he did not have any sort of identification at all. *Id.* Because Agent Hay did not feel that the individuals were being truthful in their answers to his questions,[3] the boarding team placed the individuals under arrest. *Id.* at 71. The Marine Unit then towed the yola to a marina used by CBP marine interdiction agents at Palmas del Mar, Humacao, Puerto Rico, and transferred the three people to Homeland Security Investigations and CBP field operations. *Id.* at 71–72.

At the marina, Agent Hay and Homeland Security Special Agent Brent Iglehart performed an inventory search of the yola while it was in the water. (Day 2 at pp. 72–73.) During that search, they found ten 16–gallon plastic containers that were each full and, together, contained approximately 165 gallons of unleaded gasoline valued at $729; a machete; a rope line; an anchor; an extra motor; life preservers; a battery; a blue tarp; and a cooler that contained the following—an uncut salami, uncut cheese, uncut fresh fruit, some water and alcohol. *Id.* at 73, 75, 79–80, 106–10. Agent Hay testified that while searching the front portion of the yola, he moved a

---

**3.** Agent Duff regarded the presence of five ·or six big barrels of fuel as "weird," and "highly suspect," (Transcript Day 2 at pp. 66 & 73), and he did not believe the individuals' contentions that they were on their way to the Dominican Republic. *Id.* at p. 71 ("[I]t didn't

make sense that they were going back to the Dominican Republic at that point. You would have to go around the island of Puerto Rico to get back to the Dominican Republic. They were just way outside of the geographical area.").

cooler and some line and discovered two loose bullets in a plastic bag. *Id.* at 75–77. A third loose bullet was resting by itself against the hull, and two more loose bullets were found laying on the deck in the back of the boat by the motor. *Id.* Both Agents Hay and Iglehart testified that the five 40–caliber Smith & Wesson one-inch bullets looked shiny and had likely recently been purchased or acquired. *Id.* at 77 & 110. Agent Iglehart concluded that the fact that the bullets were not corroded at that time indicated that they probably had been safeguarded or otherwise protected from exposure to saltwater. *Id.* at 110–11. The agents found no fishing gear or catch on the yola, and the yola did not smell of fish. *Id.* at 75 & 109. They also did not find any personal effects for any of the three individuals, like pictures, mementos, currency, extra clothing, or extra toiletries. *Id.* at 86 & 109.

## II. Rule 29 Standard

A court may enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. Fed. R.Crim.P. 29(a). A defendant may move the Court for judgment of acquittal within fourteen days after a guilty verdict or after the discharge of the jury, whichever is later. Fed.R.Crim.P. 29(c)(1). In this case, the guilty verdict and jury discharge occurred on June 14, 2013. (Docket 67.) Because defendant moved for judgment of acquittal on June 28, 2013, he has timely filed his motion for acquittal.

In reviewing a Rule 29 motion for judgment of acquittal, a district court must consider the evidence, both direct and circumstantial, "in the light most favorable to the prosecution" to determine whether the "body of proof, as a whole,

has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt." *United States v. Lara,* 181 F.3d 183, 200 (1st Cir.1999) (citations omitted). This standard requires the resolution of all evidentiary disputes and credibility questions in favor of the government; the Court must also draw all reasonable inferences in favor of the government's case. *United States v. Savarese,* 686 F.3d 1, 8 (1st Cir.2012); *See also United States v. Rodriguez–Marrero,* 390 F.3d 1, 6 (1st Cir.2004) (reasoning that the Court conveys the facts throughout the opinion in the light most favorable to the verdict. Thus, the jury's verdict stands unless the evidence could not have persuaded a rational trier of fact of the defendant's guilt beyond a reasonable doubt. *United States v. Soler,* 275 F.3d 146, 150 (1st Cir.2002) (citing *Lara,* 181 F.3d at 200).

## DISCUSSION

### I. Sufficiency of the Evidence Standard

Defendant Cedeño requests that the Court enter a judgment of acquittal with regard to his conviction for one count of possession of ammunition by an illegal alien unlawfully in the United States. To establish that he committed the offense, the government was tasked with proving beyond a reasonable doubt: (1) that defendant Cedeño was an alien unlawfully in the United States; (2) that he knowingly possessed ammunition, and (3) that the ammunition was connected with interstate commerce. *See United States v. Diaz,* 519 F.3d 56, 66 (1st Cir.2008). Defendant Cedeño's sole contention rests with the second element;[4] he argues that the govern-

---

4. The Court agrees that the other two elements were indeed proven beyond a reasonable doubt at trial: the parties stipulated that

defendant Cedeño was an illegal alien unlawfully present in the United States, (Docket 63 at 2), and Agent Iglehart's testimony was un-

ment failed to offer evidence establishing beyond a reasonable doubt that he knowingly possessed the ammunition found on the yola. (Docket 74 at 6.)

On several occasions, the First Circuit Court of Appeals has discussed the concept of "knowing possession" in the context of firearms, drug, and contraband cases. *See, e.g., Diaz*, 519 F.3d 56 (firearm and ammunition); *United States v. Maldonado*, 23 F.3d 4, 7 (1st Cir.1994) (cocaine); *United States v. Chapdelaine*, 989 F.2d 28 (1st Cir.1993) (firearm and ammunition); *United States v. Echeverri*, 982 F.2d 675 (1st Cir.1993) (contraband); *United States v. Garcia*, 983 F.2d 1160 (1st Cir.1993) (cocaine); *United States v. Wight*, 968 F.2d 1393 (1st Cir.1992) (firearm); *United States v. Vargas*, 945 F.2d 426 (1st Cir. 1991) (contraband); *United States v. Barnes*, 890 F.2d 545 (1st Cir.1989) (contraband). "Knowledge may be inferred from possession[,]" the First Circuit Court of Appeals has reasoned, and "[p]ossession can be either actual or constructive, sole or joint." *Wight*, 968 F.2d at 1397 (citations omitted).

By proving that a defendant was in constructive possession of ammunition, the government establishes the "knowing possession" element. *See Wight*, 968 F.2d at 1398. Constructive possession has consistently been defined as "when a person knowingly has the power and intention at a given time to exercise dominion and control over an object either directly or through others." *U.S. v. McLean*, 409 F.3d 492, 501 (1st Cir.2005) (citations omitted). Constructive possession "can be established through circumstantial evidence, though mere presence or association with another who possessed the contraband is insufficient." *United States v. DeCologero*, 530 F.3d 36, 67 (1st Cir.2008). The First

Circuit Court of Appeals has further indicated that "the requisite knowledge and intention can be inferred from circumstances, such as a defendant's control over the area where the contraband is found (e.g., defendant's home or automobile)...." *McLean*, 409 F.3d at 501 (internal citation omitted). Extending the First Circuit Court of Appeals' holding in *Wight* to an ammunition case, a defendant is in possession of ammunition as long as he or she "knowingly has the power and the intention at a given time of exercising dominion and control over [ammunition,] or over the area in which the [ammunition] is located, directly or through others." *See* 968 F.2d at 1398 (finding that a defendant's control over a van in which a weapon was found permitted the jury's inference of constructive possession); *see also United States v. Barnes*, 890 F.2d 545, 549–51 (1st Cir.1989) (holding that a defendant's dominion and control over an apartment in which drugs were found permitted the jury's inference of constructive possession); *United States v. Lochan*, 674 F.2d 960, 965–66 (1st Cir.1982) (concluding that a driver's control over vehicle in which drugs were found permitted the jury's inference of possession). A defendant's knowledge, however, "must be fairly inferable from the circumstances." *McLean*, 409 F.3d at 501; *see also Maldonado*, 23 F.3d at 7 ("The cases do not say that possession is automatic but rather that the location of the object in a domain specially accessible to the defendant can (at least where knowledge is admitted or inferred) be enough to permit the jury to find possession."); *Vargas*, 945 F.2d at 428 ("An accused's dominion and control over an area where the contraband is located may be enough to demonstrate constructive possession of the contraband located there.

controverted that because no ammunition is manufactured in Puerto Rico, the ammunition found in the yola was shipped or transported through interstate commerce.

Evidence sufficient to establish that the accused shared dominion and control of the premises can serve as a sufficient basis for inferring a knowing possession of contraband where the evidence indicates that the accused, either alone or jointly with one or more persons, intended to facilitate the possession.") (internal quotations and citation omitted). Accordingly, "there must be some action, some word, or some conduct that links the individual to the contraband and indicates that he had some stake in it, some power over it." *McLean,* 409 F.3d at 501 (citing *In re Sealed Case,* 105 F.3d 1460, 1463 (D.C.1997)).

## II. Sufficiency of the Evidence Analysis

The Court finds that sufficient evidence existed for a rational jury to find, beyond a reasonable doubt, that defendant Cedeño constructively possessed the ammunition found in the yola. The following reasonable inferences could properly have been drawn: (1) that defendant Cedeño had knowledge of the ammunition, (2) that defendant Cedeño had the power to exercise dominion and control over the ammunition, and (3) that defendant Cedeño had the intention of exerting dominion and control over the ammunition if needed.

### A. Knowledge of the Ammunition

■ There is adequate evidence to infer that defendant Cedeño had knowledge of the ammunition in the yola. He contends that there is no evidence that he had ever seen the bullets, and that he "simply could not knowingly possess bullets which he did not know even existed." (Docket 74 at 8.)

His assertions, however, are belied by the small proximity of defendant Cedeño to the bullets in plain view, his movement around the yola, and his joint dominion and control of the yola. The yola in which defendant Cedeño was confined with the bullets consisted of a small, nineteen-foot cramped space. It does appear from the pictures introduced at trial that the yola was packed with many items such that it may have been difficult to see the *entire* deck or floor of the yola. The government agents testified that the bullets were in plain view, however, resting openly in three separate areas on the yola's floor. Evidence thus reasonably leads to the conclusion that the bullets could have been seen on at least some parts of the deck where defendant Cedeño was present at sea. Throughout the duration of the trip, defendant Cedeño was seated in both the front and back sections of the yola, giving rise to a reasonable inference that he was seated within feet—if not inches—of the ammunition on the floor. Although defendant Cedeño's mere proximity to the ammunition would not be sufficient by itself to establish constructive possession, his knowledge of the ammunition may be inferred from additional circumstantial evidence. Common sense dictates, for example, that as the yola navigated choppy waters throughout the trip, the bullets freely rolled around on the deck by defendant Cedeño's feet.[5] This, in turn, supports a fair inference of his awareness of the loose bullets.

Moreover, defendant Cedeño's knowledge can be fairly inferred from evidence establishing his dominion and control over

**5.** Given that two of the bullets were found in a plastic bag, a plausible inference could be that all five shiny bullets originally had been placed on the yola together in the bag, and came loose at some point during the trip from the waves, from the impact with the Marine Unit boat, or in an attempt to scramble and throw the bullets off the boat with the small, dark, handheld object before interdiction. Given the totality of the evidence discussed below regarding his dominion and control of the yola, defendant Cedeño's knowledge reasonably can be inferred in any of those scenarios.

the yola where the ammunition was found. Testimony by the agents and Forward Looking Infrared Radar (FLIR) video places defendant Cedeño in not one, but two separate areas of the yola that contained the bullets—the front and the back. Naturally, he would have had to pass through the middle area of the yola to maneuver between the bow and the stern, and the agents testified that a fifth bullet was indeed found in that middle section. Evidence also established that defendant Cedeño was seated in the back of the yola near the motor, allowing a rational jury to reasonably infer that he drove the yola at some point in time. From defendant Cedeño's movements throughout the three sections of the yola, his presence near the motor, and evidence regarding the true purpose of the individuals' trip,[6] a reasonable inference may be drawn that defendant Cedeño had dominion and control over the *entire* deck of the yola. A rational jury, drawing reasonable inferences from the proven facts, could certainly have concluded that defendant Cedeño knew of the ammunition. *See, e.g., Echeverri*, 982 F.2d at 678 (imputing knowledge to a defendant when cocaine was in plain view in a small, cramped apartment and the defendant was seated within four feet of the contraband).

### B. Power to Exercise Dominion and Control over the Bullets

 Defendant Cedeño also had the power to exert dominion and control over the ammunition. The power component of constructive possession is "fairly straightforward." *McLean*, 409 F.3d at 504. If a defendant was physically close enough to the ammunition to pick it up at any time, then the power component is met. *United States v. DeCologero*, 530 F.3d at 67. At

trial, the government established that defendant Cedeño was present at both the front and back portions of the 19–foot yola. Shortly thereafter, Agent Hay observed bullets in plain view on the deck of the yola in those two same areas. As discussed above, and despite the cluttered appearance of the yola, the presence of the ammunition in plain view in two separate areas where defendant Cedeño was seated, coupled with the inference that the bullets rolled freely around those areas, could reasonably have permitted the jury to infer that the ammunition "was readily observable to the defendant." *See United States v. Shaw*, 670 F.3d 360, 364 (1st Cir.2012) (recognizing that the "external and readily observable" features of a gun supported a jury's inference of a defendant's knowledge). From this evidence, moreover, the jury could make the rational inference that defendant Cedeño had the power to exercise dominion and control over the ammunition because he was free to move about the boat and could at any time have reached onto the floor to physically handle the bullets. *See United States v. Van Horn*, 277 F.3d 48, 55 (1st Cir.2002) (finding the power element of constructive possession of explosives to be satisfied because the defendant "sat immediately adjacent to the bucket of explosives in the back seat of the car ... [and] was free to reach into the bucket to physically handle the explosives"). Because it was reasonable to infer that defendant Cedeño could have taken actual possession of ammunition, the element of "power" required for constructive possession is satisfied. *See United States v. Lamare*, 711 F.2d 3, 5–6 (1st Cir.1983) (constructive possession of firearm "conclusively established" where the defendant "could have taken actual possession" of a pistol).

---

6. The Court further discusses the circumstantial evidence regarding defendant Cedeño's dominion and control in its subsequent "intent" analysis of constructive possession.

### C. Intent to Exert Dominion and Control over the Bullets

The water becomes murkier, however, with regards to the third element of constructive possession: whether defendant Cedeño had an intent to exercise dominion and control over the ammunition. As the First Circuit Court of Appeals has warned, "[t]he issue of *intention* is quite as important as the issue of power.... [I]f [ ] a person had power over the [ammunition] (say, as a temporary visitor to the room in which they were located) but had no intention to exercise that power, there might still be no crime." *Maldonado*, 23 F.3d at 8. Accordingly, the Court must address whether the government proved beyond a reasonable doubt that defendant Cedeño had the intention of exerting dominion and control over the ammunition. Given the total evidence presented at trial, and drawing all reasonable inferences made in the light most favorable to the verdict, *United States v. Liranzo*, 385 F.3d 66, 70 (1st Cir.2004) (internal quotations and citations omitted), the Court concludes that the government has indeed met its burden.

■ Defendant argues that the day he was arrested was the first time he had seen or been in the yola,[7] and that no evidence was presented establishing a connection between him and the bullets. (Docket 74 at 8.) Defendant Cedeño's intention may be inferred, however, not only from the location of the ammunition in a small area to which he had access and control, but also from other circumstantial evidence establishing that his connection with the yola and ammunition was not innocent. Viewed in the light most favorable to the government, the following evidence supports the conclusions (1) that defendant Cedeño's theory of being present in the yola merely to return to the

Dominican Republic is disingenuous, and (2) that defendant Cedeño had the intention of exercising control over the ammunition:

First, the evidence regarding the yola's physical location before interdiction places the yola nowhere near the Dominican Republic or headed towards it. Pilot Garay and Agent Duff testified that the yola was detected approximately 4.5 to 5 nautical miles off the southeastern coast of Puerto Rico—a distance which Agent Iglehart testified to be 150 miles from the easternmost tip of the Dominican Republic. Evidence also supports the conclusion that the yola was not headed towards the Dominican Republic; it was either loitering in the general fishing area south of Humacao, or traveling towards St. Croix. After covertly tracking the yola's movements, Pilot Garay concluded that the yola had no predetermined course and was not traveling from point A to point B. Even disregarding his reasonable conclusion, the FLIR radar captured the yola traveling in eastern and southeastern directions, which would be movements away from the Dominican Republic. Thus, a plausible inference may be drawn that the yola was not headed for the Dominican Republic as defendant Cedeño argues.

Second, the yola's physical characteristics and the behavior of its passengers prior to interdiction are inconsistent with the theory that the yola was headed towards the Dominican Republic. Pilot Garay testified that the area where his CBP team detected the yola is well known as a fishing area, and that the CBP team took interest in the yola because none of the participants was engaged in fishing activity. Instead of dropping anchor, placing fishing buoys in the water, throwing any nets into the water, or engaging in any other type of fishing or recreational activi-

---

**7.** Defendant Cedeño's trial testimony echoed that sentiment as well. (Docket 72 at 10.)

ty consistent with expected behavior in those waters, the yola's passengers made erratic movements and appeared to be loitering in the area. A later inventory search of the yola confirmed that no fishing equipment or even the slightest smell of catch or fish was present in the yola. Rather, the agents discovered an excessive amount of packages containing 165 gallons of unleaded gasoline, along with five bullets, a machete, a tarp, an extra motor, and one cooler containing miscellaneous food and drink. Agent Hay testified that based on his expertise in marine drug interdictions, the large amount of fuel on board the yola suggested that the yola was a "refueling vessel," which generally replenish other vessels' fuel supply in furtherance of drug activity.

Defendant Cedeño contended at trial, however, that the presence of a large amount of fuel on board would be consistent with preparation measures to make the lengthy trip to the Dominican Republic safely. After reviewing the record, common sense supports the inferences that the passengers of the yola never intended to embark on the 150-mile journey to the Dominican Republic and that the fuel onboard was intended for another purpose. The sheer amount of fuel packed on the yola—165 gallons—appears to be unreasonably excessive for a 150-mile trip, unless the yola's gas mileage is less than one mile per gallon. The fact that only a single cooler was present on board with minimal water and one salami, a block of cheese, uncut fruit, and alcohol better supports a conclusion that the passengers planned a short trip out to sea than a 150-mile, multiple-hour journey through Caribbean waters and across the treacherous Mona Passage. Furthermore, none of the yola's passengers—including defendant Cedeño—brought any kind of personal effects like identification, money, or extra clothing or toiletries with them that day. Agent Christian Ammons, who interviewed defendant Cedeño at the marina, found it strange that after being in Puerto Rico for eight months, defendant Cedeño would return home completely empty-handed, with no possessions, money, or anything at all. Given the overall contents of the yola and behavior of the individuals aboard it,[8] a rational jury would reasonably be entitled to agree.

Third, the actions of the yola's passengers at the time of interdiction reasonably indicate, as the government contends, suspect and "nefarious behavior." (Day 2 at 159.) Instead of complying with law enforcement orders at sea, the passengers slowed the yola's speed, turned the yola around 180 degrees, pointed the bow directly at the Marine Unit's boat, and accelerated towards it. The yola actually

---

**8.** Agent Ammons also testified that defendant Cedeño "wasn't able to provide an answer as to why he didn't bring any money or possession[s] with him," (Day 2 at p. 153), and that he asked defendant Cedeño about the ammunition but defendant Cedeño "said he didn't know anything about it." *Id.* at 154. The jury heard defendant Cedeño testify to a similar tune at trial. (Docket 72 at 6–21.) Agent Ammons testified that he felt that defendant Cedeño was not being honest with him in his answers as far as the purpose of the three individuals' trip. *Id.* At most, however, the testimony of the witnesses involves a credibility issue, and "the standard for a Rule 29 motion for acquittal is a prosecution-friendly one that requires the resolution of all evidentiary disputes and credibility questions in favor of the government." *United States v. Lara*, 181 F.3d 183, 200 (1st Cir.1999). The Court finds that any inconsistency that might conceivably exist between the witnesses' testimonies is insufficient to overturn the jury's verdict pursuant to Rule 29, *United States v. Soler*, 275 F.3d 146, 151 (1st Cir.2002), because it is precisely the role of the jury—and not of the Court—to assess the credibility of witnesses. *United States v. Paret–Ruiz*, 567 F.3d 1, 5 (1st Cir.2009).

struck the Marine Unit's boat, scraping along the boat's port side all the way past the stern until it was behind the boat. A rational jury using sound reason could easily have inferred from this conduct alone that the yola's passengers wished to conceal *something* from law enforcement. Agents Duff and Hay's testimony that just seconds before impact, a yola passenger threw a small, dark, handheld item that hit the Marine Unit's boat with a "thud" and fell into the water, suggests further questionable behavior designed to withhold their activities from law enforcement.[9]

Taken together, the evidence supports the inference that the three individuals' presence on the yola on March 24, 2013 was for the purpose of furthering a refueling operation, not of making a 150–mile journey to the Dominican Republic. From there, the jury could reasonably conclude that the ammunition was not innocently present on the yola unbeknownst to the passengers. Testimony established that the bullets were shiny and had recently been acquired; that two of the bullets had been placed in a plastic bag; and that the additional weight of just two more people on board caused the yola to begin to sink. Thus, the contents of the yola were packed strategically and purposefully. The passengers wanted to maximize the amount of fuel able to be transported, and a reasonable conclusion can be drawn that the ammunition served a specific purpose related to the refueling operation—to protect the fuel, the yola, and all passengers in the event of trouble during the trip. *See De-Cologero,* 530 F.3d at 67 ("[T]he jury could still have concluded that the weapons were being kept for the use of the crew as a whole."); *McLean,* 409 F.3d at 504 (inference could be made that the defendant intended to use a gun "for protection in the event of trouble with one of the crack sales"); *United States v. Carlos Cruz,* 352 F.3d 499, 510 (1st Cir.2003) (defendants "had the power and intention to retrieve the firearms if and when the upcoming drug transactions turned sour"). Each piece of evidence discussed above served as the "links in a chain of evidence from which intent … could be found." *Garcia,* 983 F.2d at 1165. As the First Circuit Court of Appeals has noted, "[i]ndividual pieces of evidence viewed in isolation may be insufficient in themselves to prove a point, but in cumulation may indeed meet the mark." *United States v. Shaw,* 670 F.3d 360, 362 (1st Cir.2012). The Court concludes that this is such a case. A reasonable inference may be drawn from the totality of the circumstances that defendant Cedeño, as a passenger on the

---

**9.** The lack of direct evidence of a gun or weapon connected to the ammunition is not dispositive. "The fact that the government did not present certain kinds of evidence does not mean that there was insufficient evidence for conviction." *United States v. Liranzo,* 385 F.3d 66, 70 (1st Cir.2004) (internal quotations and citations omitted). Because five shiny bullets were found on the yola but no corresponding weapon for those bullets was recovered, a reasonable inference can be made that the object thrown overboard was a weapon. When assessing Rule 29 challenges in criminal cases, the First Circuit Court of Appeals has "remarked, time and again, that factfinders may draw reasonable inferences from the evidence based on shared perceptions and understandings of the habits, practices, and inclinations of human beings. Thus, jurors are neither required to divorce themselves from their common sense nor to abandon the dictates of mature experience." *United States v. Ortiz,* 966 F.2d 707, 712 (1st Cir.1992). In the aggregate, turning the yola 180 degrees, accelerating *into* the Marine Unit's boat, throwing a small, dark, handheld object into the water just before being interdicted, crashing into the law enforcement boat, and ultimately having no weapon on board to match the ammunition creates an evidentiary basis from which reasonable inferences regarding the handheld object and the purpose of the yola's trip may be gleaned.

yola, not only had knowledge of the ammunition, but also had a stake in it for safety. *McLean,* 409 F.3d at 501. Accordingly, he also had an intent to exercise dominion and control over the ammunition if needed, and all elements of constructive possession of the ammunition were proven against him.

## III. CONCLUSION

For the reasons expressed above, the Court finds that "the total evidence, including reasonable inferences, is sufficient to warrant a jury to conclude that the defendant is guilty beyond a reasonable doubt." *See United States v. Lochan,* 674 F.2d 960, 966 (1st Cir.1982). Accordingly, defendant Cedeño's motion to set aside the verdict and enter a judgment of acquittal as to Count One is **DENIED.**

**IT IS SO ORDERED.**