# United States Court of Appeals
## For the First Circuit

No. 19-1392

UNITED STATES OF AMERICA,

Appellee,

v.

TONY LEONARD, a/k/a Tom Cat, a/k/a Thomas Lee Jones,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Kayatta, Barron, Circuit Judges,
and O'Toole,[*] District Judge.

Robert F. Hennessy for appellant.
Julia M. Lipez, Assistant United States Attorney, with whom Halsey B. Frank, United States Attorney, was on brief, for appellee.

November 3, 2021

---

[*]Of the District of Massachusetts, sitting by designation.

**O'TOOLE, District Judge.** Defendant-appellant Tony Leonard entered a conditional guilty plea pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure to one count of possession of a firearm by a prohibited person. Prior to entering his plea, Leonard had moved to suppress evidence seized from a search of his residence. He requested a Franks hearing[1] on the ground that the affidavit in support of the warrant that authorized the search omitted material information that, if it had been included, would defeat a finding of probable cause. The district court denied the motion in a summary order. Leonard appeals the district court's rejection of his request for a Franks hearing.

We conclude that the district court did not err in denying Leonard a Franks hearing. Accordingly, we affirm that ruling.

## I.    BACKGROUND

In August 2017, Lewiston (Maine) Police Department ("LPD") Patrolman Zachary Provost submitted an affidavit in support of an application for a state search warrant during the course of an investigation into suspected drug possession, furnishing, and/or trafficking by Leonard. Provost had been employed for five years by the LPD. He was assigned to the plain-clothes Special Enforcement Team, and he had completed several

---

[1] So called because the type of hearing derives from Franks v. Delaware, 438 U.S. 154 (1978).

training courses related to drug enforcement and had participated in numerous drug investigations.

Provost sought a warrant to search Leonard himself and his residence located at 41 Walnut Street, Lewiston, for drugs, drug paraphernalia, firearms, and other evidence. His affidavit identified both Apartment #2 and Apartment #3 at that location as Leonard's residence. The apartments were described as being located in an off-white multi-unit apartment building directly above the Midtown Athletic Club. In support of his warrant application, Provost provided information said to have been received from three confidential informants or "CIs."[2]

CI-1 provided information in the hope of favorable consideration in a pending criminal case involving violation of conditions of release and drug-related offenses. CI-1 also had prior arrests for bail violations and false public alarm. Nonetheless, Provost wrote that CI-1 had "been proven reliable by providing me with information that I have deemed credible from prior investigations."

CI-1 informed Provost that a person nicknamed "TOMCAT" lived above the "Midtown" and was dealing "[c]rack." Provost knew

_____

[2] In the affidavit, Provost refers to all the confidential informants simply as "CI." For clarity, this opinion refers to the CI who provided information to Provost as CI-1, the CI who provided information to the other LPD officer as CI-2, and the CI who provided information to an agent of the Maine Drug Enforcement Agency as CI-3.

- 3 -

from prior experience that Leonard used the street name "TOMCAT," had a prior conviction for drug trafficking, and had recently been released from prison. Existing internal LPD records confirmed Leonard's use of the alias and identified 41 Walnut Street #3 as his residence. Additionally, a review of his prior criminal history confirmed that Leonard had numerous convictions for drug possession and trafficking.

CI-1 reported to Provost that TOMCAT had apartments on the second and third floors. He stated that the second-floor apartment was the "TRAP" spot that was unfurnished except for a folding card table and was commonly used as a "[p]arty [s]pot." He reported that TOMCAT lived in the third-floor apartment with his girlfriend.

CI-1 further stated that TOMCAT had video monitoring devices in the hallways. TOMCAT had access to the surveillance equipment at all times and typically watched it while dealing "[c]rack [c]ocaine." CI-1 had seen TOMCAT in possession of a pistol and ammunition and, within a week or so before the warrant application, had observed TOMCAT packaging "[c]rack [c]ocaine" for distribution inside the second-floor apartment. He reported that TOMCAT kept his firearm and narcotics on the second floor, but he did not know where TOMCAT kept his drug proceeds.

During the course of the investigation, Provost received information from another LPD Officer about another registered

confidential informant, CI-2. According to the other officer, CI-2 had prior arrests for theft, operating after a suspension, and forgery, but had previously provided information that was deemed credible by police and had led to an arrest. CI-2 claimed to be interested in reducing drug trafficking in the city because drugs had "directly affected this CI's life."

CI-2 provided information to the police that TOMCAT was staying at 41 Walnut Street and was dealing "HARD," which Provost knew from his experience was a street term for crack cocaine. CI-2 stated he could purchase "[c]rack [c]ocaine" from TOMCAT at any time. On August 14, 2017, CI-2 reported that TOMCAT lived in the third-floor apartment, but utilized the second-floor apartment to deal "[c]rack." CI-2 reported there was constant foot traffic coming and going from the rear door of the building and that TOMCAT was often seen standing in the rear parking lot. CI-2 also stated that the residence was equipped with video surveillance.

On August 15, 2017, Provost spoke with an agent of the Maine Drug Enforcement Agency, who informed him that agents had recently made contact with CI-3, a cooperating defendant. CI-3 reported to them that TOMCAT was the largest drug trafficker in the area. CI-3 stated that TOMCAT had apartments on the second and third floors above the "Midtown Bar" on Walnut Street. CI-3 further stated that TOMCAT's customers typically used the rear entrance located on Bartlett Street. CI-3 had recently observed

- 5 -

approximately 1.5 ounces of "[c]rack [c]ocaine" and 1 ounce of "[c]ocaine HCL" in the apartment, where he had also previously observed firearms. CI-3 did not know who owned the firearms.

Shortly before Provost applied for the warrant, the LPD conducted a controlled purchase of cocaine from Leonard, utilizing one of the confidential informants.[3] According to the affidavit, officers searched the CI for contraband and equipped him with an electronic recording and monitoring device. Officers followed the CI to the parking lot at 41 Walnut Street, where the CI made contact with Leonard. The CI observed Leonard enter the back door leading to both the second- and third-floor apartments and return moments later. The CI provided TOMCAT with pre-counted, recorded United States currency in exchange for a quantity of cocaine. After the buy, the CI turned over cocaine to a detective. A field test indicated the presence of Cocaine HCL.

On August 16, 2017, a state court judge issued the warrant to search Apartments #2 and #3 at 41 Walnut Street. The next day, LPD officers executed the search warrant. Officers found Leonard inside the third-floor apartment. Nearby was a jacket which contained a handgun and magazine. Officers also found cocaine, crack cocaine, more than $10,000 in U.S. currency, and a key that opened the second-floor apartment. In the second-floor apartment,

---

[3] The affidavit does not identify which of the three CIs made the purchase.

officers found recently purchased furniture in Leonard's name, a bill bearing his name, a handgun case corresponding to the handgun previously seized, another loaded magazine, a digital scale with white powder residue, a box of plastic baggies, and a firearm cleaning kit.

A grand jury returned a federal indictment against Leonard charging him with one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and one count of possession with the intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Prior to trial, Leonard filed a motion to suppress the results of the August 17th search of 41 Walnut Street, as well as evidence seized pursuant to subsequent search warrants predicated on the evidence from the search on August 17. He sought a hearing pursuant to Franks v. Delaware on the basis of what he claimed were two material omissions from the warrant affidavit.

First, Leonard argued that Provost failed to disclose that significant interfering background noise prevented the electronic recording and monitoring device from capturing usable audio information. Leonard contended that the omission created the false impression that something of evidentiary value had actually been recorded or monitored, implicitly boosting the affidavit's narrative. Second, Leonard argued that Provost failed to disclose that after completing the controlled buy, the CI did not meet

- 7 -

immediately with police but rather left the area in a car with an unidentified person and, only after that, met up with police to turn over some cocaine. Leonard argued that the circumstance raised the possibility that the CI had obtained the cocaine from some source other than Leonard, including the person with whom the CI had left the area. Disclosure of that fact, he argued, would have weakened the case for probable cause.

In response, the government contended that the omitted information would not have materially weakened the probable cause determination, and that even if the warrant affidavit was deemed to lack probable cause, thus invalidating the warrant, the officers had relied in good faith on the judicially authorized search warrant. See United States v. Leon, 468 U.S. 897 (1984).

The district court denied both Leonard's Franks motion and his motion to suppress in a brief written decision. The district court accepted Leonard's factual allegations as true but concluded that Leonard had not demonstrated that he was entitled to a Franks hearing. As to the failure to note that the recording equipment carried by the CI did not provide corroboration for the CI's own narrative, the district court found that it was not a material omission because the affiant did not suggest that the recording device had led to confirming information. As to the presence of the unnamed additional person in the car with the CI, the district court determined that even if the affidavit had

- 8 -

included the information, it would not have sufficiently cast doubt on the significant amount of other information in the affidavit that supported probable cause, particularly the consistency of the information provided by the separate CIs. The court also concluded that the probable cause standard would have been met even if the omitted information had been included in the warrant affidavit. The district court did not address the government's alternative good-faith reliance argument.

After his conditional plea, Leonard was sentenced by the court to ninety-six months' imprisonment.[4] Leonard had reserved his right to appeal the district court's order denying the request for a Franks hearing and motion to suppress, and he timely filed this appeal.

## II.  DISCUSSION

Leonard challenges the district court's denial of his request for a Franks hearing and consequently its denial of his motion to suppress the fruits of the search. "In considering a district court's decision to deny a Franks hearing, [this Court] review[s] factual determinations for clear error and the probable cause determination de novo." United States v. Arias, 848 F.3d

---

[4] Leonard pled guilty with respect to possession of a firearm by a prohibited person. The second count of the indictment, possession of cocaine with intent to distribute, was dismissed by the district court upon the government's motion.

504, 511 (1st Cir. 2017) (citations omitted); accord United States v. Barbosa, 896 F.3d 60, 67 (1st Cir. 2018).

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." U.S. Const. amend. IV. This requires the judicial officer considering a warrant application "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [them], including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Tanguay, 787 F.3d 44, 50 (1st Cir. 2015) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). "Performance of this task must take account of the totality of the circumstances." Id. (citing Gates, 462 U.S. at 238).

Information supporting probable cause may be set out in an affidavit submitted with the application for a search warrant. An affidavit supporting a search warrant is presumptively valid. United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013). However, a defendant may rebut this presumption and challenge the veracity of the affidavit in a pretrial hearing, "eponymously called a Franks hearing." Barbosa, 896 F.3d at 67 (citations omitted). At a Franks hearing, if a defendant shows by the preponderance of the evidence that the affidavit "contains false statements or

- 10 -

omissions, made intentionally or with reckless disregard for the truth, and that a finding of probable cause would not have been made without those false statements or omissions, then the defendant is entitled to the suppression of evidence obtained under that warrant." Arias, 848 F.3d at 511 (citing Tanguay, 787 F.3d at 49).

A defendant, however, is not entitled to a Franks hearing as a matter of right. Rather, he first must make a "'substantial preliminary showing' . . . that 'a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth' and that the false statement or omission was 'necessary to the finding of probable cause.'" Id. at 511 (quoting United States v. McLellan, 792 F.3d 200, 208 (1st Cir. 2015)). When a defendant claims there were material omissions from the facts asserted in an application, he must therefore show that the omission was "intentional or reckless" and that "the omitted information, if incorporated into the affidavit, . . . [is] sufficient to vitiate probable cause." Tanguay, 787 F.3d at 49.

Against this backdrop, we turn to Leonard's attempt to persuade the Court that the district court erred in its conclusion that he had failed to make a threshold showing sufficient to entitle him to a Franks hearing. He contends that if the affidavit were reformed to include the omitted facts regarding the background noise and the presence of another individual in the cooperator's

vehicle, the affidavit would have been insufficient to establish probable cause that a search of Leonard's residence would turn up evidence of a crime.[5] He also claims the affidavit was insufficient to establish a nexus to Leonard's third-floor residence.

A.        **Sufficiency of the Affidavit**

The district court found that an affidavit reformed as Leonard claims it should be would still support probable cause because the omitted information would not have sufficiently negated the considerable force of other information in the affidavit, particularly the consistency of information provided by three separate confidential informants.

When, as here, the showing of probable cause is based primarily on information provided by CIs with some additional corroboration by police investigation, we apply a "nonexhaustive list of factors" to examine the affidavit's probable cause showing. United States v. Tiem Trinh, 665 F.3d 1, 10 (1st Cir. 2011).

> These factors include, among others, (1) whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information; (2) whether an informant's statements reflect firsthand

---

[5] Leonard also attempts to address the first element of the Franks test, i.e., that the affiant intentionally or with reckless disregard for the truth omitted information from the affidavit. However, he does so only cursorily. But we need not consider whether Leonard has waived this argument because we conclude that Leonard has failed to satisfy the second element of the Franks test and thus his challenge fails on that ground.

> knowledge; (3) whether some or all [of] the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance); and (4) whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information.

Id. (quotation marks and citations omitted). "Because '[n]one of these factors is indispensable,' a stronger showing of supporting evidence as to one or more factors may effectively counterbalance a lesser showing as to others." Id. (alteration in original) (quoting United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996)).

A reformed affidavit to include what Leonard claims was improperly omitted information would satisfy the Tiem Trinh factors. First, the affidavit established the probable veracity of the CIs. As to CI-1, Provost stated the source had proven reliable in the past with information Provost had deemed credible from prior investigations. See United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002); see also Tiem Trinh, 665 F.3d at 10-11 (noting that references to a CI's history of providing information to authorities provides "some assurance of reliability"); United States v. Khounsavanh, 113 F.3d 279, 286-87 (1st Cir. 1997). Though CI-1 had pending charges at the time, providing perhaps an incentive to falsify information, "[t]he risk that the informant is lying or in error need not be wholly eliminated. Rather, what

- 13 -

is needed is that the probability of a lying or inaccurate informer has been sufficiently reduced by corroborative facts and observations." See Khousavanh 113 F.3d at 284 (internal quotations omitted). As to CI-2, despite previous arrests, the source had provided information in the past that had been found credible and had resulted in an arrest. See Tanguay, 787 F.3d at 50. CI-2 was not working for any consideration, but rather claimed to be motivated by personal experience to help to reduce drug trafficking in Lewiston. There is no particular background information about CI-3, but his trustworthiness is enhanced by the fact the information CI-3 provided implicated himself to some degree because he had personally observed drugs and firearms in Leonard's apartment. See id. (noting that trustworthiness may be enhanced by the extent to which statements are against interest). Additionally, none of the CIs were anonymous tipsters; rather, they were "known to the police and could be held responsible if [their] assertions proved inaccurate or false." See Barnard, 299 F.3d at 93.

Second, the information provided by the CIs was based on firsthand information and/or provided detailed information about Leonard's criminal activity. See Gates, 462 U.S. at 234; Barnard, 299 F.3d at 93. Their reliability is bolstered by the "extent and level of detail" of their information regarding the drug trafficking operation in the apartments, which reflected "hidden,

illegal activity, and not generally obtainable, irrelevant, or non-incriminating facts." See Tiem Trinh, 665 F.3d at 11. CI-1 reported that he had been inside the apartment and had personally observed Leonard packing crack cocaine for distribution and possessing a pistol and ammunition. Additional information specifically described the two apartments, the occupants and furnishings, location of video monitoring devices, specifics about Leonard's behavior, and other details. Similarly, CI-3 had personally observed the presence of drugs and firearms in the apartment and also provided details as to the use of the apartments and how drug customers would enter the building.

Third, several components of the CIs' information were corroborated. Significantly, there was "cross-corroboration" between the multiple sources to different law enforcement officers.[6] See Barnard, 299 F.3d at 94. All three reported that

_____

[6] Leonard suggests that because Provost refers to each confidential informant as "CI", it is possible that there are not three different CIs but rather just a single CI. The district court, however, concluded the opposite, finding that the affidavit contained "consistent information provided by multiple confidential informants." We do not think this finding was in clear error. The way each CI is described in the affidavit shows that Provost understood each CI to be a different person. See Barnard, 299 F.3d at 94. Provost provided different criminal histories, motivations for working with law enforcement, and contributions to prior investigations for each CI. Moreover, each CI interacted with a different law enforcement officer and provided different details of TOMCAT's operation that were broadly consistent. See id. at 94-95.

- 15 -

Leonard dealt crack cocaine. All three described Leonard's use of the two apartments on the second and third floors of 41 Walnut Street, with two of them detailing that Leonard lived on the third floor and dealt drugs on the second floor. Two described the video surveillance, two observed a firearm, and two noted that customers used the rear door. Further, Provost himself conducted some independent investigation regarding the details, including reviewing the LPD system to verify that Leonard used the alias "TOMCAT," that he lived at the address identified by the CIs, that he had prior convictions for drug possession and trafficking, and that he had been recently released from prison.[7] "Taken together, the source[s'] account[s]" and the detective's investigation provided "substantial corroboration for the CI[s'] crucial allegation of criminal conduct by defendant at his home." See id. at 95.

Additionally, officers engaged a CI in a controlled buy. The CI was searched for contraband before the buy and was followed to Leonard's residence at 41 Walnut Street. The CI made contact with Leonard, who was observed entering the rear door of the

---

[7] Leonard contends that Provost's review of the LPD's internal records does not count as corroboration for these purposes because the information was publicly available. But the alias TOMCAT was not readily available to the public.

- 16 -

building and returning with a substance which later tested positive for cocaine.

To be sure, the controlled buy was not free from problems, and those problems were not disclosed in the warrant affidavit. The recording and monitoring device placed on the CI was ultimately unhelpful because of significant background noise. However, the affidavit did not state that the device documented useful evidence,[8] and officers were able to surveil 41 Walnut Street to at least some extent during the buy. Somewhat more problematic is that the CI traveled away from 41 Walnut Street with another person before meeting the agents to turn over the purchased cocaine, raising at least a speculative possibility that someone other than TOMCAT had been the source of the drugs the CI turned over to police. But a "less than ideal" controlled buy can still provide some support for a probable cause finding, particularly where, as here, the buy yielded information that was consistent with what the police were told by the three CIs. Khounsavanh, 113 F.3d at 286; see also, e.g., United States v.

---

[8] Indeed, the affidavit cites the CI personally and not a recording as the source of information as to TOMCAT'S activities during the buy. Leonard's contention that the affidavit "nowhere suggests that police surveilled or even attempted to surveil the suspect resident during the alleged transaction" is simply not consistent with what the affidavit reports. The affidavit states that the "CI was followed to the parking lot of 41 Walnut [Street]" and that "[a]fter conducting the transaction[,] said CI was followed back to the designated meet location."

- 17 -

<u>Genao</u>, 281 F.3d 305, 309 (1st Cir. 2002); <u>United States</u> v. <u>Garcia</u>, 983 F.2d 1160, 1166-67 (1st Cir 1993). Probable cause only requires a showing of a "fair probability" that contraband or evidence would be found in the apartment, <u>Khounsavanh</u>, 113 F.3d at 283, and the other aspects of the buy (including the CI's report that Leonard provided the cocaine), the cross-corroboration of detailed information about Leonard's criminal activity in the residence, and the independent verification about residence, alias, and criminal background by Provost, sufficiently corroborated the CIs' factual statements advanced in support of the warrant.

Finally, as to the fourth <u>Tiem Trinh</u> factor, Provost assessed from his professional experience the probable significance of the informants' information. He described his five years on the task force, his prior experience investigating drug trafficking cases, and his experience preparing and participating in the execution of numerous search warrants. He noted that based on his training and experience, it was common for drug traffickers to store in their residence records pertaining to their operations, drug paraphernalia, and sums of money that are drug proceeds. "In the eyes of the issuing justice, these statements could have boosted the reliability" of the CIs' information as to Leonard's

- 18 -

drug trafficking and firearms possession. See Barnard, 299 F.3d at 95.

Taken together, these facts--even based upon a reformed affidavit to include the omissions--were sufficient to give the issuing judge a substantial basis upon which to conclude that there was a fair probability that contraband or evidence of a crime would be found.

**B.    Nexus to Third-Floor Apartment**

We turn to Leonard's alternate argument. He contends that the affidavit, if reformed, would be insufficient to establish a fair probability that evidence material to any crime would be found in Leonard's third-floor apartment specifically. The government argues in response that the claim should only be reviewed for plain error because Leonard forfeited the theory by never expressly arguing before the district court that the reformed affidavit failed to establish nexus to the third-floor apartment. The government further argues that even if the argument had been fully preserved, Leonard cannot show that the reformed affidavit would have undercut probable cause to search both apartments.

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched—the so-called 'nexus' element." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999). With respect to

the "nexus" element, a judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. (alteration in original) (quoting Gates, 462 U.S. at 238). "The criterion . . . is whether the facts presented in the affidavit would 'warrant a man of reasonable caution' to believe that evidence of crime will be found." Id. at 87 (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)).

With respect to a suspected drug dealer's residence, "[t]he inquiry is not whether 'the owner of the property is suspected of crime' but rather whether 'there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought.'" United States v. Roman, 942 F.3d 43, 51 (1st Cir. 2019) (quoting Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978)). "A nexus . . . need not, and often will not, rest on direct observation, but rather can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]." Id. (alterations in original) (internal quotation marks omitted) (quoting Feliz, 182 F.3d at 88). To permit such an inference of a nexus to a defendant's residence, the court looks to whether "generalized observations" that "drug dealers tend to

store evidence in their homes" are combined with "specific observations, or facts, connecting the drug dealing to the home," such as "evidence that drug distribution was being organized from [the defendant's] residence, that the defendant used his home as a communications hub for drug activity, or that the defendant move[d] back and forth from his residence in relation to the drug transactions." Id. at 51-52 (alterations in original) (citations omitted) (internal quotations omitted).

It is not necessary for us to decide whether Leonard waived the nexus argument, because even if it were preserved, Leonard cannot show the district court committed any error in finding that the reformed affidavit would have supported probable cause to search both the second- and third-floor apartments.

Provost made several "generalized observations" based on his training and experience, such as the commonality of individuals involved in illegal trafficking of drugs to: possess and store more than one kind of scheduled drug; possess, maintain, and keep at their residence records, journals, or notes pertaining to drug trafficking; possess, maintain, and keep at their residence drug paraphernalia; and possess, maintain, and keep with or near them, including at their residence, sums of money.

The affidavit in this case combined those generalized observations with "specific observations" connecting Leonard's suspected drug trafficking to his third-floor apartment. While CI-

1 and CI-2 described the specific drug trafficking as occurring on the second floor, there was nevertheless sufficient information to infer evidence would be found on the third floor as well. Two CIs described Leonard's use of surveillance equipment which monitored the hallways and common areas of the building. There appeared to be a common street-level door that led to both floors and frequently was utilized by customers and also by Leonard during drug deals.

CI-1 noted that Leonard possessed a firearm and ammunition, evidence that would likely be present where he lived and not just where he conducted sales. Leonard had a history of drug-related convictions and, when asked, CI-3 reported that Leonard was the largest drug trafficker in the area at the time. According to CI-1, the "TRAP" spot itself was sparsely furnished, containing only a folding card table, permitting the inference that Leonard kept important items, such as his cash and items he bought with his drug proceeds, in a separate "safe yet accessible" place, like his home. See, e.g., Feliz, 182 F.3d at 87–88. And, of course, the place in which CIs observed Leonard to be in possession of drugs and a firearm was just below his own known residence, making it likely he could easily move such things between the two apartments. The facts that would have been presented in a reformed affidavit would still "warrant a man of reasonable caution" to

believe it reasonably likely that evidence of crime would be found in Leonard's third floor apartment. See id. at 86.

In sum, there was no error in the district court's ruling that Leonard had failed to make the threshold showing necessary to obtain a Franks hearing. If the omitted information had been included in the warrant application, the reformed affidavit would nevertheless have justified the necessary finding of probable cause to search both apartments.

### III. CONCLUSION

For the foregoing reasons, we affirm.