# United States Court of Appeals
## For the First Circuit

No. 22-1807

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN RODRIGUEZ, a/k/a Mula, a/k/a Mula Monopoly,

Defendant, Appellant.

Nos. 23-1255
     23-1256

UNITED STATES OF AMERICA,

Appellee,

v.

JUNITO MELENDEZ, t/n Junior Melendez,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Kayatta, Circuit Judges.

Rory A. McNamara, with whom Drake Law LLC was on brief, for defendant Rodriguez.

Jonathan Shapiro, with whom Mia Teitelbaum and Shapiro & Teitelbaum LLP were on brief, for defendant Melendez.

Karen L. Eisenstadt, Assistant United States Attorney, with whom Joshua S. Levy, Acting United States Attorney, was on brief, for the United States.

August 23, 2024

**SELYA**, **Circuit Judge**.  A jury in the United States District Court for the District of Massachusetts convicted defendants-appellants Juan Rodriguez and Junito Melendez of, inter alia, conspiracy to distribute and possess with intent to distribute more than 500 grams of cocaine.  The defendants claim that the trial was plagued by erroneous evidentiary rulings and defective jury instructions.  In addition, Melendez claims that his sentence rested on incorrect guideline calculations.  Discerning no error, we affirm.

**I**

We briefly rehearse the relevant facts and travel of the case.  Because these appeals do not present challenges to the sufficiency of the evidence but, rather, deal with other claims of error, we rehearse "the facts in a 'balanced' manner in which we 'objectively view the evidence of record.'"  United States v. Amador-Huggins, 799 F.3d 124, 127 (1st Cir. 2015) (quoting United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015)); see Gray v. Genlyte Group, Inc., 289 F.3d 128, 131 (1st Cir. 2002) (explaining that, for issues such as admissibility of evidence and appropriateness of jury instructions, "evidence offered by either side or both may be pertinent").[1]

---

[1] Some of our older cases suggest that — even in the absence of a sufficiency challenge — we should rehearse the facts in the light most favorable to the verdict.  See United States v. Rodríguez-Soler, 773 F.3d 289, 290 (1st Cir. 2014).  Having

**A**

Melendez and Rodriguez were convicted of working with several associates to carry out a scheme to purchase and distribute large quantities of cocaine in Massachusetts and New Hampshire. The government's case against them was as follows. Melendez was the front man of the enterprise: he interacted with customers and suppliers while Rodriguez managed the back-end operations from his residence in Worcester, Massachusetts. The two men acquired at least some of the trafficked cocaine from Angel Cordova (whom the government believed to be their primary supplier). They then cooked portions of the acquired cocaine into crack cocaine, which they sold along with the rest of the powder cocaine. Their principal customer was Carlos Richards (Lito) who lived in Manchester, New Hampshire. To transport the contraband from Worcester to Manchester, the defendants sometimes employed couriers.

---

reexamined those decisions in light of the weight of modern authority, we abrogate them. In doing so, we have followed the procedure described in cases such as <u>Trailer Marine Transport Corp.</u> v. <u>Rivera Vazquez</u>, 977 F.2d 1, 9 n.5 (1st Cir. 1992), <u>Gallagher</u> v. <u>Wilton Enterprises, Inc.</u>, 962 F.2d 120, 124 n.4 (1st Cir. 1992), and <u>Carpenters Local Union No. 26</u> v. <u>United States Fidelity & Guaranty Co.</u>, 215 F.3d 136, 138 n.1 (1st Cir. 2000). The panel opinion in this case was circulated to all active judges of the court prior to publication. None interposed an objection to our proposed course of action. We caution, however, that the use of this informal procedure does not convert this opinion into an opinion en banc, nor does it preclude a suggestion of rehearing en banc on any issue in this case.

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) began focusing on the defendants in the summer of 2018 after local police in Worcester requested assistance with an ongoing probe. As relevant here, the ATF took custody of Melendez's iPhone in December of 2018 while he was detained on a charge unrelated to these appeals. The ATF secured a search warrant for the iPhone's contents and subsequently obtained three authorizations for wiretaps of the iPhone. Based on information that was recovered from the iPhone (such as photographs and notes) and conversations that were recorded by means of the wiretaps, the ATF and local police tracked the defendants' drug operations over the next few months. We briefly recount these drug transactions as they pertain to the issues on appeal.

When the authorities arrested the defendants, the charges that they lodged stemmed from a series of seemingly scattered drug transactions that occurred over a period of approximately three months. Our odyssey along this trail begins on April 2, 2019, when a local police officer in Worcester observed one of Melendez's associates, Lujan Burgos, enter Melendez's residence and depart less than an hour later. Burgos was subsequently stopped and arrested for driving on a suspended license. A search of his person incident to his arrest yielded twenty-two grams of crack cocaine, which the government suspected

- 5 -

Burgos had procured from Melendez during his brief visit to Melendez's residence.

The next day — April 3 — Rodriguez called Melendez for assistance in bailing out Burgos. Melendez responded that he would "make some moves" and that he should be able to help the next day — a response that hinted that Melendez would receive proceeds from a later cocaine sale. One of the enterprise's couriers, Antoine Mack, was to deliver cocaine to Richards in Manchester that afternoon. Local police observed Mack first at a dwelling in Worcester (later referred to as "Mula's spot") at which Melendez's vehicle was parked. Mack spent only a short time in the Worcester residence, after which tailing ATF agents lost sight of him. The government suspected that it had just witnessed Mack pick up a cocaine shipment from Melendez to transport to Richards in Manchester.

Mack reappeared at Richards's residence, where he made only a quick stop and departed with a bag in hand. A later-discovered video showed Mack in his vehicle in Manchester with what looked like a large sum of cash in his lap. Mack then returned to Massachusetts and made another pilgrimage to Melendez's residence. After these events had transpired, Melendez told Rodriguez that he had secured the necessary funds to help bail out Burgos. From the government's perspective, this chain of events

indicated that Mack had successfully delivered the cocaine to Richards and returned the proceeds to Melendez.

We fast-forward to April 12. On that date, Melendez telephoned Cordova, who reported that he "got five" — a statement which the ATF case agent understood to mean 500 grams of cocaine. Several additional telephone calls ensued during which the men discussed a meeting location for the transfer of the cocaine. Following these calls, Worcester police observed a "possible Hispanic male" leave the meeting location with what looked like a food container in a plastic bag. The government argued that police had just witnessed Melendez purchase cocaine from Cordova.

This brings us to April 22. On that date, Melendez instructed Mack to go to Mula's spot, which the government understood as a direction to pick up cocaine and deliver it to Richards in Manchester. Mack's trip, though, was interrupted by a police officer who stopped him on an unrelated charge and had his vehicle towed. The officer recovered a plastic bag during the stop, but it did not contain contraband.

Mack and Melendez regrouped and again attempted to execute the transaction. Attuned to their communications through the wiretaps, the ATF sent an agent to conduct surveillance. The surveilling agent observed an individual drive to Richards's residence in Manchester. The surveilling agent suspected that the purpose of this trip was to deliver cocaine. But because it was

dark and raining, the agent could not identify the messenger. Even so, after tailing the messenger's vehicle to a gas station on its return journey, the agent was able to identify Mack as the driver. The agent followed the vehicle to a house in Worcester and watched Mack enter the house with a bag in hand. It could reasonably be inferred from this observation that Mack returned with the proceeds from his most recent cocaine delivery.

Later that week (on April 25), Melendez informed Cordova that he needed "seven or eight," which the ATF case agent interpreted to mean 700 or 800 grams of cocaine. On April 27, after further telephone exchanges, Melendez and Cordova were seen driving together toward a Massachusetts residence. On May 6, Cordova telephoned Melendez and — according to the ATF case agent's interpretation — agreed that Cordova would sell Melendez 500 grams of cocaine. ATF agents then observed Cordova, another courier (Kevin Jean), and a third unidentified person meet at Mula's spot.

The following day, Melendez telephoned Richards. The case agent — interpreting coded language — testified that this call was intended to make plans to deliver 400 grams of cocaine to Richards in New Hampshire. Subsequent communications between Melendez and Jean supported an inference that Jean met with Richards that afternoon. On May 16, the case agent — again interpreting coded language — concluded that Melendez intended to procure at least 500 grams of cocaine from Cordova. This

- 8 -

conclusion was based on the case agent's review of a telephone call between Melendez and Cordova, which reflected that Melendez told Cordova that he would buy "[p]robably more, but five minimum." A day later, Cordova communicated to Melendez that he had "531 in one piece," a statement that the case agent interpreted to mean 531 grams of cocaine in one "brick." Melendez directed Cordova to come to his residence, where video footage shows the two men meeting for about three minutes.

On May 23 and 24, Melendez and Cordova discussed the possibility of Cordova again supplying Melendez with cocaine. These discussions proceeded notwithstanding the fact that Melendez was displeased with the quality of the product that he had received earlier. On May 24, Melendez ordered "three" from Cordova, which the case agent interpreted to mean 300 grams of cocaine. This order was placed after Cordova advised Melendez that he had secured a different source of supply for the drugs.

Melendez and Cordova subsequently were seen inside a Massachusetts residence, after which Melendez told Rodriguez that he could have "1 or 2." Following a telephone call with Melendez, Richards arrived at that location (about thirty minutes after Cordova had left) and then departed with a bag in hand. Shortly thereafter, two officers stopped Richards and found about 200 grams of cocaine, about 105 grams of crack cocaine, and many "white

papers" in his possession. The officers confiscated the contraband but did not arrest Richards.

On June 5, ATF agents executed search warrants at Melendez's and Rodriguez's homes and arrested both men. In July, a federal grand jury sitting in the District of Massachusetts charged the defendants with one count of conspiracy to distribute and to possess with intent to distribute cocaine. See 21 U.S.C. § 846; see also id. § 841(a)(1). The indictment further charged that 500 grams or more of cocaine was reasonably foreseeable and attributable to Melendez and that he had a prior conviction for a serious drug felony, see 21 U.S.C. § 802(57) — circumstances that warranted enhanced penalties under 21 U.S.C. § 841(b)(1)(B)(ii). The grand jury separately charged Melendez with one count of conspiracy to interfere with commerce by robbery (Hobbs Act robbery). See 18 U.S.C. § 1951.

**B**

After a thirteen-day trial at which the government presented evidence of these events, the jury found both Melendez and Rodriguez guilty of conspiracy to distribute cocaine and conspiracy to possess with intent to distribute 500 grams or more of cocaine. See 21 U.S.C. § 846. The jury separately found that Melendez had distributed 500 grams or more of cocaine under circumstances in which such distribution was reasonably foreseeable, after he had previously been convicted of a serious

drug felony.  See 21 U.S.C. § 841(b)(1)(B)(ii).  Finally, Melendez pleaded guilty to conspiracy to commit Hobbs Act robbery.  See 18 U.S.C. § 1951.

The district court sentenced Rodriguez to a 52-month term of immurement for the drug conspiracy.  The court sentenced Melendez to concurrent terms of imprisonment of 156 months for his two conspiracy convictions.  These timely appeals followed.

## II

We start with Melendez's challenge to the search warrant and wiretaps issued for his iPhone.  The wiretaps, in particular, yielded many of the communications deployed against Melendez at trial.

## A

Some additional background is useful.  While Melendez was in police custody on an unrelated matter, the ATF confiscated his phone and sought a search warrant for its contents.  The government supported the warrant application with an affidavit from the ATF case agent asserting that there was probable cause to believe that Melendez committed drug and firearm trafficking offenses for which the phone's contents would provide evidence. The affidavit identified two confidential sources (both of whom have prior convictions and were cooperating in return for potential leniency on pending criminal charges).

- 11 -

The first source advised that Melendez was the leader of the Massachusetts section of the Vice Lords gang and possessed and distributed firearms. The second source substantiated the allegations of Melendez's role in the Vice Lords and his possession and distribution of firearms. That source also disclosed that Melendez was involved in the distribution of kilograms of crack and powder cocaine and that he sanctioned the use of violence to protect his drug-distribution activities.

A magistrate judge issued a search warrant, and the government collected a mass of information on which it relied for a later wiretap application. In support of the wiretap application, the case agent explained that law enforcement was investigating Melendez's firearm and drug-distribution operations. The case agent noted Melendez's prior conviction, his apparent involvement in various criminal activities, and the statements from the two confidential sources. In addition, the case agent noted statements from two more confidential sources. The third source substantiated Melendez's involvement in the Vice Lords gang and his firearms dealings, and the fourth source was identified as a potential cooperator. The court granted the application. Two other wiretap applications, which relied in part on evidence from the first wiretap, were also granted.

Melendez filed motions to suppress both the evidence obtained from the iPhone and the communications intercepted

through the wiretap. The district court denied these motions. Melendez now challenges these denials.

**B**

We begin by rehearsing standards of review applicable to the denial of motions to suppress evidence from search warrants and wiretaps.

**1**

When presented with a challenge to the denial of a motion to suppress, "we examine the district court's 'factual findings for clear error and its legal conclusions, including its ultimate constitutional determinations, de novo.'" United States v. Sheehan, 70 F.4th 36, 43 (1st Cir. 2023) (quoting United States v. Moss, 936 F.3d 52, 58 (1st Cir. 2019)). Where, as here, the principal "basis for a probable cause determination is information provided by a confidential informant, the affidavit must provide some information from which a magistrate can credit the informant's credibility." United States v. Gifford, 727 F.3d 92, 99 (1st Cir. 2013). Put bluntly, "the probability of a lying or inaccurate informer [must have] been sufficiently reduced." United States v. Greenburg, 410 F.3d 63, 69 (1st Cir. 2005). To assess an informant's credibility, we look to factors such as:

> (1) whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all

- 13 -

of the informant's factual statements were corroborated wherever reasonable or practicable (e.g., through police surveillance); and (4) whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information.

Gifford, 727 F.3d at 99.

**2**

Congress has instructed that law enforcement must make several specific showings before intercepting wire, oral, or electronic communications. See 18 U.S.C. § 2518(3). A wiretap application must show probable cause to believe "that an individual is committing, has committed, or is about to commit a [qualifying] offense." Id. § 2518(3)(a). So, too, the application must show probable cause to believe that the intercepted communications will yield information about the offense and "that either the individual or the offense is sufficiently connected to the means of communication that [the government] seeks to surveil." United States v. Encarnacion, 26 F.4th 490, 497 (1st Cir. 2022); see 18 U.S.C. § 2518(3)(b), (d).

What is more, the application must show that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). In short, the wiretap must be reasonably necessary to the investigation. See Encarnacion, 26

- 14 -

F.4th at 497. We will affirm a wiretap if "the application was at least 'minimally adequate' to support the authorization of the wiretap." Id. (quoting United States v. Gordon, 871 F.3d 35, 43 (1st Cir. 2017)). So long as the application clears this bar, a motion to suppress the fruits of the wiretap will be denied. See Gordon, 871 F.3d at 46.

## C

We separately address the iPhone search and the wiretaps.

## 1

Melendez contends that the search of his iPhone lacked probable cause because the supporting affidavit from the case agent (which incorporated the confidential sources' accounts) was not credible. He says that the case agent failed to provide any information in support of the sources' credibility. See United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002) (explaining that "[a] mere assertion of reliability without any information regarding the basis for the officer's belief, such as past tips leading to arrests," is a minimum showing that "is entitled to only slight weight" (internal quotations omitted)). He adds, moreover, that the confidential sources' past criminal convictions and current quest for leniency undermine their credibility. Without independent evidence of credibility, his thesis runs, these sources "had every reason to lie" in exchange for more

- 15 -

favorable resolution of their pending criminal charges. He adds that the information provided came without "any explanation for the[] basis of knowledge and consisted of conclusory allegations of criminal conduct devoid of the specificity necessary to determine whether the information was based on personal knowledge or hearsay."

These arguments fail because they depend upon balkanization of the evidence. As a start, the fact that the confidential sources were cooperating with law enforcement does not, in and of itself, undermine their credibility. See United States v. Leonard, 17 F.4th 218, 225 (1st Cir. 2021) (explaining that, although confidential source "had pending charges at the time, providing perhaps an incentive to falsify information," this concern could be eased by offering information that corroborated the source's account); see also United States v. Vongkaysone, 434 F.3d 68, 74 (1st Cir. 2006) (explaining that, when one becomes an informant in exchange for potential leniency with pending criminal charges, "it [is] to his advantage to produce accurate information to the police so as to qualify for the leniency he [seeks]").

To be sure, a source may overstate his knowledge in the hope that the government can use what little information he can provide to make an arrest and, thus, afford him leniency. The source may even fabricate information, such as in an attempt to mislead the government in furtherance of the criminal enterprise.

See, e.g., United States v. Ramírez-Rivera, 800 F.3d 1, 28 (1st Cir. 2015), overruled on other grounds by United States v. Leoner-Aguirre, 939 F.3d 310, 316-17 (1st Cir. 2019); United States v. Vigeant, 176 F.3d 565, 570 (1st Cir. 1999).

In the case at hand, evidence supporting the veracity of the sources' information defeats any such theory. Each source spoke directly to investigators, so if either of them had later been found to be lying, he would have been exposed to additional punishment. This provided an incentive for the sources to be truthful in their accounts. See Barnard, 299 F.3d at 93 ("Unlike an anonymous tipster, [a cooperating source is] . . . known to the police and could be held responsible if his assertions prove[] inaccurate or false."). Additionally, it is noteworthy that the two separate sources both confirmed essentially the same information about Melendez's gang affiliation and criminal activities. This level of consistency furnishes a form of internal corroboration. See Leonard, 17 F.4th at 226 (noting importance of "cross-corroboration" among sources).

There is more. To bolster the sources' credibility, the government discloses additional context as to how the first two sources acquired their information. Notably, they observed some of Melendez's criminal activities first-hand. See United States v. Maglio, 21 F.4th 179, 186 (1st Cir. 2021) (noting that confidential source's reliability is bolstered if he "personally

- 17 -

observed criminal activity").  The first source saw Melendez possess and/or distribute up to thirty-five firearms.  The second source was in a trailer with Melendez when he saw Melendez cook crack cocaine.  He also explained that Melendez generally had access to firearms and, on at least one occasion, observed Melendez in possession of a particular 9mm firearm.

Even when these sources proffered information that was not based on personal observation, they included extensive details showing that they "ha[d] a legitimate basis [to] know[]" or that an uninvolved person could not have "easily know[n]" that information.  United States v. Khounsavanh, 113 F.3d 279, 284 (1st Cir. 1997).  For example, these sources shared the identities of additional gang members and some of Melendez's firearm straw purchasers.  They also alerted the government to another unreported shooting.  Melendez does not assign clear error to the district court's reliance on any of these facts — which further undermines his suggestion that the informants lacked credibility.

Last — but far from least — the government corroborated the informants' accounts with independent information.  The address of the gang house was confirmed when law enforcement connected it to an overdose.  The authorities confirmed that the unreported shooting did occur.  And the government showed that Melendez was linked to a couple of the firearm purchases.  Once

again, Melendez does not assign clear error to the district court's reliance on any of these facts.

To say more would be to paint the lily. Taking into consideration "the 'totality of the circumstances' disclosed in the supporting affidavit[]," we conclude that it showed "a fair probability that contraband or evidence of a crime [would] be found" in a search of the phone. Barnard, 299 F.3d at 93 (quoting United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996)).

**2**

Because the iPhone search was lawful, we must reject Melendez's derivative argument that the wiretaps relied on fruit of the poisonous iPhone tree. See Utah v. Strieff, 579 U.S. 232, 237 (2016). The evidence in support of the wiretaps is even stronger because it included a third confidential source who spoke directly to law enforcement and corroborated the allegations made by the first two sources. That leaves his contention that the government failed to satisfy the necessity requirement as to the wiretap applications. In that regard, our inquiry focuses on whether "other investigative procedures [were] tried and failed" or whether the government explained "why [these procedures] reasonably appear[ed] to be unlikely to succeed if tried or [would] be too dangerous." United States v. Santana-Dones, 920 F.3d 70, 76 (1st Cir. 2019) (quoting United States v. Nelson-Rodriguez, 319 F.3d 12, 32 (1st Cir. 2003)); see 18 U.S.C. § 2518(1).

- 19 -

Melendez argues that the wiretap application did not "explain why information from recorded phone conversations, text messages, and controlled drug buys between [the fourth confidential source] and [Melendez] would not accomplish the goals of the investigation." This argument lacks force.

The wiretap affidavit offered at least three compelling reasons for the search. The case agent explained that sophisticated organizations remain wary of other methods, particularly confidential informants who try to infiltrate the organization. The government had tried and failed to introduce two separate confidential informants into the organization. And a confidential informant posing as a buyer could learn only so much about the structure of the conspiracy and the identities of those involved. Consequently, we hold that the district court did not err in finding that the government satisfied the necessity requirement by "offer[ing] specific and reasonable explanations why" other investigative techniques "would have been unproductive, too dangerous, or insufficient to achieve its investigative goals." Encarnacion, 26 F.4th at 501. And because the court supportably concluded that the government satisfied the statutory requirements for a wiretap and did not rely on any clearly erroneous facts, we see no principled basis for overturning its denial of Melendez's motion to suppress.

The defendants jointly challenge two categories of admitted evidence that they deem both improper and unduly prejudicial under prevailing evidentiary rules.

**A**

Prior to trial, Melendez filed a motion in limine, seeking to exclude any law enforcement interpretation of statements made during the wiretapped conversations. During trial, Rodriguez made the same objection. The defendants argued that any such interpretation would constitute impermissible lay testimony under Federal Rule of Evidence 701. See Fed. R. Evid. 701. The district court reserved decision. At trial, however, the court denied the motion as to some testimony. The defendants now appeal.

A few additional facts help to provide useful context. The government's principal witness at trial was the ATF case agent, who relied heavily on experience gained from his work over a decade and a half in law enforcement. This work included extensive experience in drug investigations. As the lead agent in this investigation, he reviewed numerous text messages and telephone calls that had been intercepted under the wiretap. Although he was never designated as an expert witness, the court permitted him to offer his opinion on the meaning of several obscure statements

gleaned from these text messages and telephone calls. The defendants assign error to the admission of this testimony.

**B**

We review a preserved objection to the district court's admission or exclusion of evidence for abuse of discretion. See United States v. Kilmartin, 944 F.3d 315, 335 (1st Cir. 2019). A discretionary decision "cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Id. (quoting In re Josephson, 218 F.2d 174, 182 (1st Cir. 1954)).

Withal, abuse of discretion is not a monolithic standard. See United States v. Padilla-Galarza, 990 F.3d 60, 73 (1st Cir. 2021). It "encompasses 'de novo review of abstract questions of law, clear error review of findings of fact, and deferential review of judgment calls.'" Id. (quoting United States v. Lewis, 517 F.3d 20, 24 (1st Cir. 2008)).

Federal Rule of Evidence 701 requires that opinion testimony from a witness who is not testifying as an expert be "rationally based on the witness's perception"; "helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. "Application of Rule 701 in the drug-trafficking context is

not novel: 'we have long held that government witnesses with experience in drug investigations may explain the drug trade and translate coded language' for factfinders through lay opinion testimony." United States v. Dunston, 851 F.3d 91, 96 (1st Cir. 2017) (quoting United States v. Rosado-Pérez, 605 F.3d 48, 56 (1st Cir. 2010)); accord United States v. Hoffman, 832 F.2d 1299, 1310 (1st Cir. 1987) (holding that one who is experienced in the field can "interpret[] . . . codes and jargon used in the drug trade" under Rule 702). To comply with the constraints of Rule 701, "such interpretive testimony must be anchored in the witness's personal experience in the field . . . and his experience-based understanding of the meaning of the terms used." Dunston, 851 F.3d at 97. Of course, such a law enforcement officer must limit his interpretation to language that is "peculiar to the[] defendants" in the particular case and ground his interpretation "largely on [his] immersion in the details of [the relevant] investigation." United States v. Albertelli, 687 F.3d 439, 446-47 (1st Cir. 2012).

## C

On appeal, the defendants first attack the case agent's testimony, "[b]ased on [his] experience in this investigation," that "Shit Lito" described transporting cocaine to Lito who lived in New Hampshire and that "Mula's spot" was 69 Cutler Street in

Worcester (where cocaine was distributed).[2]  (Alterations in original.)  The defendants assert that the case agent was not "understanding, interpreting, and translating purposefully confusing drug lingo." United States v. Belanger, 890 F.3d 13, 25 (1st Cir. 2018).  To the contrary, they contend that "he was interpreting perfectly clear communications about a meeting between [Melendez] and Mack to infer that Mack was going to obtain cocaine from [Melendez] and deliver it to a person in New Hampshire, even though Mack's car was stopped and searched on the way to New Hampshire and no drugs were found."

In this circumstance, it is within the trial court's discretion to allow a law enforcement officer to provide lay opinion testimony when he can — based on his experience with drug investigations and his involvement in the current case — "explain the drug trade and translate coded language." Dunston, 851 F.3d at 96 (quoting Rosado-Pérez, 605 F.3d at 56).  When the witness

_____

[2] Because neither defendant objected to all the testimony that we discuss below, some aspects of their challenges have not been properly preserved and, thus, invite plain error review. See United States v. Belanger, 890 F.3d 13, 27 (1st Cir. 2018) (holding that "individual defendants in a joint criminal trial are required to raise their own objections unless the district court 'specifically states that an objection from one defendant will be considered an objection for all defendants'" (quoting United States v. Leon-Delfis, 203 F.3d 103, 113 (1st Cir. 2000))).  But the government "treats these challenges as raised by both [d]efendants" and does not invoke the plain error standard.  We follow the government's lead and evaluate the district court's challenged rulings for abuse of discretion.

deciphers a coded phrase, that "'interpretation . . . ought to be explicable' — a standard that typically requires the witness to point to similar statements surrounding similar events." Id. at 97 (quoting Albertelli, 687 F.3d at 450). Even so, a court must exclude such testimony when "the witness is no better suited than the jury to make the judgment at issue." United States v. Vázquez-Rivera, 665 F.3d 351, 363 (1st Cir. 2011) (quoting United States v. Meises, 645 F.3d 5, 16 (1st Cir. 2011)).

Here, the district court had a sufficient basis to find that the case agent's testimony satisfied these standards. The defendants' contrary contention misunderstands the purport of the testimony. Because the expressions "Shit Lito" and "Mula's spot" are unclear to one without inside knowledge of the defendants' mode of communication, it was within the court's discretion to allow the experienced case agent to explain that the defendants used this jargon as shorthand for transporting cocaine and describing a house owned by Rodriguez's (Mula's) family from which the defendants facilitated drug distribution. Although no interpretation was needed to understand that a meeting was discussed, it was unclear where the meeting was to occur ("Mula's spot") and what purpose it served ("Shit Lito").

We discern no abuse of discretion in allowing the government to fill these gaps. The case agent had reviewed thousands of telephone calls and text messages between the

defendants and their co-conspirators and could interpret them with the benefit of many years of immersion in the drug-trafficking world. The record supports the district court's conclusion that he was readily familiar with the defendants' linguistic preferences and the likely meaning of their jargon. See Belanger, 890 F.3d at 25-26 (permitting lay opinion testimony by officer who had worked for DEA for about sixteen years, was a case agent on the matter, had helped "conduct[] physical surveillance," and had "listen[ed] to the thousands of calls as they came in"); Albertelli, 687 F.3d at 447 (permitting lay opinion testimony by officer who had investigated matter for years, had become "familiar with the voices of the major participants," and had studied other materials recovered from defendants). And the jury stood to benefit from his specialized knowledge. Accordingly, the defendants' claim of error fails.

Even so, the case agent's testimony went further by concluding that the government "believed . . . Mack was going to obtain cocaine from . . . Melendez at 69 Cutler Street and transport it to Lito in Manchester, New Hampshire." The defendants suggest that, by offering this conclusion, the case agent was inferring guilt from "'the totality of information gathered' in the agent's investigation." United States v. Agramonte-Quezada, 30 F.4th 1, 19 (1st Cir. 2022) (quoting United States v. García-Sierra, 994 F.3d 17, 26 (1st Cir. 2021)). This function, they

say, is the sole province of the jury.  Cf. García-Sierra, 994 F.3d at 26-27 (explaining that "overview testimony" by law enforcement "'effectively usurp[s] the jury's role as fact-finder' by suggesting which inferences the jury should draw from the evidence appropriately before it" (alteration in original) (quoting Meises, 645 F.3d at 16)).

We reject this suggestion.  The case agent offered this opinion in response to a question about specifically identified telephone calls that discussed this meeting.  He was not cobbling together scattered evidentiary bricks to construct a "summary overview" of a broader conspiracy for which this suspected drug transaction provided evidence.  United States v. Pérez-Vásquez, 6 F.4th 180, 199 (1st Cir. 2021).  Given the case agent's experience and the context here, we believe that it was within the trial court's discretion to allow him to offer an opinion on the meaning of specific and limited conversations and, thus, to admit the challenged testimony.[3]

---

[3] Although this testimony resembles later testimony to which the court sustained an objection ("[W]e believed that . . . Mack obtained cocaine from 69 Cutler Street and was transporting that cocaine to Manchester, to . . . Richards."), the two situations are not comparable.  In the latter situation, the case agent offered the cited opinion in response to a question that asked him to consider a more extensive range of evidence — making it more likely for the jury to regard his proffered testimony as a government-sanctioned summary of the evidence portraying the defendants as guilty of the crimes charged.

Nor does the fact that officers did not find cocaine during a search of Mack's vehicle throw shade on the case agent's ability to offer interpretive testimony as to the defendants' communications. See Robinson v. Watts Detective Agency, Inc., 685 F.2d 729, 739 (1st Cir. 1982) ("Whether . . . [a witness's] opinion is accurate goes to the weight of the testimony, not its admissibility."). That this one search came up empty may raise a question about the government's theory that the drug-distribution scheme described in the defendants' communications was effectuated. But it says nothing dispositive about the government's showing that the case agent was familiar with drug vernacular generally and with the defendants' jargon specifically. It was this familiarity that qualified the case agent to offer his interpretation of language particular to the defendants' operations. See Albertelli, 687 F.3d at 446.

We do not gainsay that the absence of cocaine in the vehicle of the person whom the government believed to be the transporter provided exculpatory evidence with respect to the ultimate issue of guilt. But the appropriate way to explore this discrepancy was through cross-examination. See Dunston, 851 F.3d at 97 (explaining that voir dire and cross-examination of law enforcement witness who provided interpretive testimony "mitigated any risk of unfair prejudice from his testimony"). Here, however, the defendants failed to call attention to this discrepancy on

cross-examination.  And as we explained earlier, the accuracy of an opinion poses a question distinct from the question of its admissibility.  See Robinson, 685 F.2d at 739.  Thus, this claim of error fails.

**D**

The defendants both challenge the case agent's testimony, based on his experience and the context of the conversations, that various numbers and terms referred to specific amounts of cocaine.  We sample some of these conversations.

The case agent interpreted "the whole thing" as referring to one kilogram of cocaine.  "I got five," he said, referred to 500 grams of cocaine.  Needing "seven (7) or eight (8) something like that" meant 700 or 800 grams of cocaine.  "I'm still waiting on that shit" signified that the person "was likely waiting on his own supplier for cocaine."  And "I got 531 in one piece" referred — as the case agent saw it — to 531 grams of cocaine that needed to be sold in a single transaction.

The defendants do not deny that they used these phrases in their discourse with each other.  They submit, however, that the case agent "was being asked to interpret what was otherwise plain English" and that "the jury was, or would [have] become, well-educated enough as to the nature and scope of the alleged conspiracy to make its own determination as to the quantity of

drugs being discussed, if, indeed, drug quantities were even being discussed at all."

They add that — aside from general references to context — the case agent never explained his interpretations. For example, there was no elaboration as to why phrases like "the whole thing" were code words that carried more than their ordinary meaning. With no significant ambiguity, the defendants maintain, the case agent, in effect, was telling the jury what result to reach.

When a law enforcement officer provides interpretive testimony as lay opinion, the government must erect a foundation to ensure that the opinion fulfills the requirements of Rule 701. See United States v. Prange, 771 F.3d 17, 27 (1st Cir. 2014). For its part, the district court must assess whether the "law enforcement officer . . . is equipped by knowledge, experience, and training to break [criminal] codes [such that his testimony] can help to inform the factfinder's understanding" of the communications at issue. Dunston, 851 F.3d at 97. Moreover, the witness must "point to [a] rational basis for the interpretation offered" such that his opinion does more than just speculate. Albertelli, 687 F.3d at 447.

In this instance, we think that the defendants are too quick to discount the vagueness of their communications. If it was unclear that the communications were even discussing drugs (as the defendants suggest), it would be puzzling to call these

communications unambiguous such that interpretive testimony would be forbidden. For example, the phrase "still waiting on that shit" makes clear that the speaker is waiting on something but remains unclear as to what the speaker may be waiting for. It follows that one familiar with communications between these persons (and drug vernacular in general) is well-situated to explain that such vague expressions described drug transactions. See United States v. Valbrun, 877 F.3d 440, 444 (1st Cir. 2017) (permitting co-conspirator to explain vague statements like "putting the thing," "my stuff," and "hid[ing] it well" (alteration in original)).

It is perhaps more difficult to justify the government's reading of numbers that appeared to refer to quantities of cocaine. After all, reading Arabic numerals requires no special expertise. In addition, other communications did not use single digits to represent large quantities but, rather, wrote out three-digit numbers (e.g., "531 in one piece"). Finally, the search of one residence uncovered only about two grams of cocaine, perhaps indicating that the defendants sometimes did deal in single-digit quantities of cocaine. Against this backdrop, the defendants suggest that the single-digit numbers in the relevant communications might have meant just that — single-digit grams of cocaine.

We think that the defendants are more ready than the circumstances permit to assume their own interpretation of these

communications. Although a number like "five" might refer to five grams of cocaine (as the defendants submit), it also might be shorthand for 500 grams (as the government contends). Moreover, there is no reason that "five" — without further context — could not plausibly mean five kilograms (which would not be a facially unreasonable amount for veteran drug distributors to handle). So, too, it is common in many situations to omit the units or zeroes after a number when that information would be clear from the context. See, e.g., Belanger, 890 F.3d at 28-29 (noting importance of context to understanding vague "[p]hrases like 'drop 10 off'"); Dunston, 851 F.3d at 96-97 (permitting DEA agent "to testify about the meaning of slang terms and jargon" because, among other considerations, he "took into account the context in which those terms were used"). Police found several hundred grams of cocaine on Richards's person, meaning that the enterprise involved hundreds of grams of crack and cocaine. And the one three-digit number (531) that they wrote out could not have been abbreviated the way other three-digit numbers were abbreviated (such as 500 becoming "5") without losing specificity in the last two digits. Given his familiarity with the drug trade, the case agent was well suited to resolve the uncertainties surrounding the defendants' cryptic numerical references. See Albertelli, 687 F.3d at 446-47.

We are mindful that no direct evidence confirms the case agent's specific interpretations. But these points show that plausible competing interpretations exist for the language used. And the case agent's testimony on these points provided the defendants with ample fodder for cross-examination. They could have pressed the case agent on why he understood these numbers to refer to hundreds of grams of cocaine, but they eschewed that course of action.

That leaves the defendants' contention that the case agent failed to explain the specific bases for his interpretations. See Prange, 771 F.3d at 28 (noting importance of "an objective basis for the agent's understanding that [defendant] knew they were speaking in coded terms and his impression of what [defendant] actually meant"). They maintain that the case agent's testimony was based on nothing more than his review of the telephone calls that the jury — without specialized knowledge — could have listened to and understood to form its own opinion. This contention misses the mark.

The case agent reviewed the voluminous record — which would have been impractical to present to the jury in its entirety — with the advantage of over a decade of experience in drug investigations. Based on this experience, he could more readily determine when and how the defendants employed ambiguous language to mask their discussions of illegal activities. For example, he

observed that the defendants spoke about drugs in a "guarded" manner, which contrasted with how they spoke about other topics (like personal affairs).  And he connected these conversations to other aspects of the investigation, such as drug transactions that the police had observed.  On this scumbled record, we cannot say that the district court abused its wide discretion by admitting this testimony for such an interpretive purpose.

### E

On the sixth day of trial, two local police officers each testified that they were assigned to a "gang unit."[4]  The district court overruled Rodriguez's objections and denied his request for a limiting instruction.  Before us, he asserts — based on these testimonial tidbits — that jurors may have inferred unfairly that he and Melendez were in a gang and, thus, had an "agreement . . . to work together to achieve unlawful ends."  In a close case "where proof of [his] willful agreement" to distribute or possess with intent to distribute drugs was "otherwise lacking," Rodriguez posits, seemingly small details like this one might have "tipped the scales" in convincing the jury that he was guilty of conspiracy.

---

[4] Several days later, a third officer mentioned that he had performed surveillance with an officer "from the gang unit." Neither defendant objected to this comment, and we regard any such objection as waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

The government demurs. It submits that these few mentions simply provided background and points out that there was never an allegation that either defendant belonged to a gang. Rodriguez rejoins that the picture is not quite as unambiguous as the one the government tries to paint: in his view, the government recognized the potential for bias, yet highlighted the prejudicial aspects of the testimony that was admitted. In support, he notes that the government complied with the court's request not to mention any affiliation that other law enforcement witnesses may have had with a gang unit.

Inasmuch as Rodriguez objected below, our review of this claim of error is for abuse of discretion. See Kilmartin, 944 F.3d at 335. It is, of course, arguable that the mention of a gang unit may have left more than a passing impression on the jurors. That possibility is problematic because this information had no apparent relevance to the ATF's work in uncovering the defendants' drug-distribution activities. And here, unlike in United States v. Liranzo, 385 F.3d 66 (1st Cir. 2004), the court did not give a limiting instruction to minimize potential prejudice. See id. at 71-72 (discerning no abuse of discretion in allowing officers to testify about their "assignments to the gang task force" when "the evidence was not admitted to show [the defendant's] gang membership and the limiting instruction made that clear").

Even with these considerations in mind, we need not tarry. We take no view as to whether admitting this testimony was error at all: the testimony was harmless in any event. Aside from a few offhand references to a gang unit, there is no sign that the government presented its case in a way that either suggested that the conspiracy was organized by a gang or that any defendant was acting as a member of a gang. And as the defendants acknowledge, the most damning evidence against them was their communications, which the case agent characterized as describing drug transactions. This evidence was reinforced by other proof, such as cocaine recovered from physical searches. Given that the gravamen of the government's case was unrelated to any potential gang affiliation, we conclude that "it is highly probable that [any] error did not influence the verdict." United States v. Piper, 298 F.3d 47, 56 (1st Cir. 2002).

Rodriguez questions this reasoning. He suggests that the jury's uncertainty about whether a conspiracy had been proven (as evidenced by its question, see infra at 41) made it more likely that the jury eventually relied on other factors — like the defendants' imputed gang membership — in concluding that the defendants were guilty. Jurors, he muses, may have inferred that the defendants intended to enter into an agreement to distribute cocaine because membership in a gang "implies an agreement . . . to work together to achieve unlawful ends." But

this is unadulterated conjecture, and we are left to speculate as to whether the jury may or may not have followed this line of reasoning.

The jury would have had to construct a chain of inferences to impute an illegal agreement between Rodriguez and Melendez based on the testifying officers' gang-unit assignments when no other mention of a gang appeared at trial. Nor can we agree with Rodriguez's assertion that "proof of [his] willful agreement to advance" the cocaine-distribution conspiracy was "otherwise lacking." To the contrary, the government's evidence showed that the drug-trafficking operation used Rodriguez's residence to dispatch drugs, that the operation used Rodriguez's car to ferry drugs to New Hampshire, and that Rodriguez cooked crack cocaine on Melendez's instruction. Consequently, we are left without sufficient reason to believe that the verdict was tainted by prejudice associated with the passing mentions of a gang unit. We therefore reject Rodriguez's claim of error.

**IV**

Rodriguez also mounts a challenge to the jury instructions.

**A**

"When a party assigns error not to the substance of a jury instruction but to the court's decision to give a requested instruction at all, our review is de novo." Shervin v. Partners

Healthcare Sys., Inc., 804 F.3d 23, 47 (1st Cir. 2015). To prevail on a claim of failure to give a requested instruction, the requesting party must show that "the omitted instruction [was] integral to an important part of the case and its content [was legally correct and] not otherwise substantially covered by the instructions as given." Id.

"Like the district court, [w]e examine the evidence on the record and . . . draw those inferences as can reasonably be drawn therefrom, determining whether the proof, taken in the light most favorable to the [requesting party,] can plausibly support the theory of the [party]." United States v. Baird, 712 F.3d 623, 627 (1st Cir. 2013) (first and second alterations in original) (internal quotations omitted). When all is said and done, a reviewing court must determine "whether the evidence, viewed in the light most favorable to the proponent of the instruction, justifies jury consideration of the underlying issue." Butynski v. Springfield Term. Ry. Co., 592 F.3d 272, 276 (1st Cir. 2010).

If the requesting party has failed to preserve a claim of instructional error, our review is only for plain error. See United States v. Pennue, 770 F.3d 985, 989 (1st Cir. 2014). Under this demanding standard, the party must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial

proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

**B**

Rodriguez first contends that, because the government had to carry the burden of proof in establishing the identities of "the players," a jury instruction warning of the inaccuracy of cross-racial identifications was critical to ensure that the jury correctly identified the conspirators. Nevertheless, the district court refused his request to instruct on cross-racial identification. Rodriguez assigns error to this refusal.

As relevant here, a white officer identified Mack, a Black man, as the driver of a vehicle purportedly carrying drugs while it was dark and rainy. White officers also identified other individuals who were either Black or Hispanic. Had an instruction highlighting these concerns been given, Rodriguez insists, jurors may have doubted his involvement in the charged conspiracy.

Because this claim of error was preserved, our review is de novo. Shervin, 804 F.3d at 47. Nevertheless, the claim fails. The most conspicuous badge of failure is that the requested instruction does not address a sufficiently important issue. To begin, Rodriguez himself was never implicated in the conspiracy through a cross-racial identification. His claim of error relies on the possible misidentification of his co-conspirators such that the jury would have doubted that he conspired with anyone to

possess and distribute drugs. But the government need not prove the identity of each and every conspirator; it need only prove that at least one other person conspired with the defendant to commit the charged offenses. See United States v. Pena, 24 F.4th 46, 75-76 (1st Cir. 2022). As long as Rodriguez engaged in this conspiracy (for which there was copious evidence beyond encounters with potentially misidentified co-conspirators), it was immaterial that others may have been misidentified in particular encounters.

Let us be perfectly clear. We express no opinion on whether a cross-racial identification instruction might sometimes be legally required. We hold only that, in these circumstances, the omitted instruction was not "integral to an important part of the case." Shervin, 804 F.3d at 47. Accordingly, Rodriguez's claim of error comes up empty.

## C

Rodriguez next contends that the evidence showed — at most — that he trafficked in cocaine, not that he was a member of the charged conspiracy. As a result, he maintains, the court committed reversible error by not giving a buyer-seller instruction.[5] In other words, he contends that the district court

---

[5] Although the purchase of illicit drugs reflects an unlawful agreement between the buyer and the seller, such a transaction does not necessarily include the additional elements needed to prove a conspiracy to possess and distribute drugs. See United States v. Moran, 984 F.2d 1299, 1303 (1st Cir. 1993) (explaining that conspiracy requires, inter alia, "[c]ommon knowledge,

- 40 -

should have instructed the jury that an agreement to purchase "1 or 2," in itself, was insufficient to prove the charge of conspiracy. Because this claim of error was not advanced below, our review is for plain error. See Pennue, 770 F.3d at 989.

Plain error is plainly absent. The meat of the requested instruction was substantially covered elsewhere in the court's charge. For example, the court's conspiracy instruction required the jury to find that each particular defendant intended to engage in the conspiracy. It follows that, the jury — in accordance with the district court's instructions — could not have convicted Rodriguez of conspiracy if it believed that the evidence proved no more than a buyer-seller transaction between Rodriguez and Melendez. See United States v. Moran, 984 F.2d 1299, 1303 (1st Cir. 1993).

To cinch the matter, the district court — after the jury had begun its deliberations — responded to a jury question on this subject. The court told the jurors that, as a precursor to a finding of guilt on the conspiracy charge, "[i]t is not enough to prove that the defendants conspired to purchase cocaine." This supplemental instruction sufficiently distinguished a simple one-

interdependence, [and] shared purpose"). In a conspiracy to acquire and distribute cocaine, "two individuals agree that one of them will sell cocaine and the other will assist." Id. By contrast, in a buyer-seller transaction, "one merely sells the same cocaine to another without prearrangement and with no idea of or interest in its intended use." Id.

off purchase of cocaine from Melendez (as Rodriguez characterized his involvement) from a more complex conspiracy to purchase and distribute large amounts of cocaine as a middleman (as the government characterized his involvement). Put another way, Rodriguez could not have been convicted of conspiracy to distribute and conspiracy to possess with intent to distribute cocaine (as the indictment charged) if all he had agreed to undertake was to purchase cocaine once from Melendez. See supra note 4.

To be sure, Rodriguez may have drawn some solace from the precise language of his requested buyer-seller instruction. But a defendant is not entitled to dictate the trial court's phraseology. As "long as the charge sufficiently conveys the [party]'s theory, it need not parrot the exact language that the [party] prefers." United States v. McGill, 953 F.2d 10, 12 (1st Cir. 1992). Nor is the district court "obligated to instruct on every particular that conceivably might be of interest to the jury." United States v. DeStefano, 59 F.3d 1, 3 (1st Cir. 1995). In this instance, we are convinced that the thrust of the requested buyer-seller instruction was substantially covered by other instructions. See Shervin, 804 F.3d at 47. Consequently, we cannot say that it was error at all — let alone clear or obvious error — either to omit a buyer-seller instruction or to refrain from providing a more detailed conspiracy charge.

In the revised presentence investigation report (PSI Report), the probation officer responded to the government's objection to the original report by increasing its drug weight calculation from about three kilograms to about four kilograms. This elevated Melendez's base offense level to twenty-eight. See USSG §2D1.1(c)(6). In the process, the probation officer declined to adopt Melendez's contention that the government was engaged in double counting and that, therefore, the drug weight should total around 1.75 kilograms for a base offense level of twenty-four. See id. §2D1.1(c)(8). The probation officer also rejected the government's suggestion that Melendez should receive a four-level "organizer or leader" enhancement instead of a three-level "manager or supervisor" enhancement. See id. §3B1.1(a)-(b).

At the disposition hearing, Melendez reprised his objection to the drug-weight calculation. He explained that the government's figure double-counted some of the cocaine by including the same amount on both purchase and sale. See United States v. Lee, 892 F.3d 488, 491 (1st Cir. 2018). The government conceded that it would be improper to count the same cocaine both when it was purchased and when it was sold but disputed that any such double counting had occurred. The court agreed with the government. In addition, the court sustained the government's objection to the lesser role-in-the-offense enhancement,

classified Melendez as an organizer or leader, and imposed the four-level enhancement.  See USSG §3B1.1(a).

With another adjustment (not material here), the court calculated a total offense level of thirty-four.  Combined with his criminal history category (IV), he faced a guideline sentencing range of 210 to 262 months.  The court proceeded to impose a downwardly variant sentence of 156 months.

Melendez challenges two enhancements.  First, he assails the attribution to him of 4.2 kilograms of cocaine — an attribution that put him over the 3.5-kilogram threshold needed to elevate his base offense level from twenty-six to twenty-eight.  See id. §2D1.1(c)(6)-(7).  Second, he challenges the four-level "organizer or leader" enhancement.  See id. §3B1.1(a).  We deal with these challenges sequentially.

## A

"[W]e review the [sentencing] court's interpretation and application of the sentencing guidelines de novo and assay any subsidiary findings of fact for clear error."  United States v. Walker, 665 F.3d 212, 232 (1st Cir. 2011).  "[T]he usual rules of evidence do not pertain at sentencing.  Rather, the . . . court may base sentencing determinations on any evidence that it reasonably finds to be reliable."  Id.

The government bears the burden of proving any sentencing enhancement by a preponderance of the evidence.  See

id.  Where, as here, there is no direct evidence of the total quantity of drugs attributable to a drug-trafficker, the sentencing court may make "[a] 'reasoned estimate[] based on historical data.'"  United States v. Bernier, 660 F.3d 543, 546 (1st Cir. 2011) (second alteration in original) (quoting United States v. Platte, 577 F.3d 387, 392 (1st Cir. 2009)).  This "drug-quantity calculation is a factual finding" that we review for clear error.  United States v. Kinsella, 622 F.3d 75, 86 (1st Cir. 2010).

So, too, because "[r]ole-in-the-offense determinations are innately fact-specific, . . . 'we review such determinations only for clear error.'"  United States v. Rostoff, 53 F.3d 398, 413 (1st Cir. 1995) (quoting United States v. Dietz, 950 F.2d 50, 52 (1st Cir. 1991)).  To show that a defendant qualifies for the "organizer or leader" enhancement, "the government's evidence must satisfy both a scope requirement (that is, the evidence must show that the enterprise involved five or more participants or was otherwise extensive) and a status requirement (that is, that the defendant acted as an organizer or leader of the enterprise)."  United States v. Rivera, 51 F.4th 47, 51 (1st Cir. 2022).

For guidance in evaluating a defendant's role in the criminal enterprise, the guidelines lay out seven factors to consider:

> [T]he exercise of decision making authority,
> the nature of participation in the commission
> of    the    offense,    the    recruitment    of

accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

USSG §3B1.1, cmt. n.4. "This list is intended to be representative rather than exhaustive[, and t]here need not be proof of each and every factor before a defendant can be termed an organizer or leader." United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995).

**B**

We turn first to the drug-weight enhancement. See USSG §2D1.1(c)(6). Melendez asserts that the calculated cocaine weight of 4.2 kilograms double-counted certain drug quantities by including the same cocaine when he purchased it and when he sold it. See Lee, 892 F.3d at 493 (recognizing "possibility of a reversible error due to . . . double counting"). In his view, the evidence reasonably reflected only the following amounts of cocaine: 750 grams on March 14; 500 grams on April 12; 700 grams on April 27; 500 grams on May 6; 531 grams on May 16; and 307.7 grams on May 25. And if these amounts were the sole basis for an accurate estimate, the total drug quantity should have been 3,288.7 grams (about a kilogram less than the amount for which the court sentenced him).

Melendez says that the 120 grams cooked into crack cocaine on March 24, the twenty-two grams transferred to Burgos on April 2, and the 400 grams sold to Richards on April 3 all came from the 750 grams that he had received from Cordova on March 14. In addition, he says that the 400 grams given to Richards on April 22 were part of the 500 grams that he had received from Cordova on April 12. This double counting, he maintains, was what elevated the total amount of drugs attributable to the conspiracy to exceed the 3.5-kilogram threshold needed to increase his base offense level by two levels. See USSG §2D1.1(c)(6)-(7).

Because a sentencing court's "drug-quantity calculation is a factual finding," our review is for clear error. Kinsella, 622 F.3d at 86. And in the absence of direct evidence of the total quantity of drugs, the court may rely on a reasonable estimate of the total quantity. See Bernier, 660 F.3d at 546. Thus, "our job 'is not to see whether there is any view of the evidence that might undercut the district court's finding; it is to see whether there is any evidence in the record to support the finding.'" Kinsella, 622 F.3d at 86 (quoting United States v. Wade, 114 F.3d 103, 105 (7th Cir. 1997)).

We start with the April 22 transaction and, specifically, the 400 grams that allegedly came out of the 500

grams that Melendez had procured from Cordova.[6] Melendez's characterization of this transaction does not withstand scrutiny. Although Cordova may have been Melendez's primary supplier, he was not necessarily Melendez's sole supplier. For example, in one recorded conversation, Melendez appeared to be sourcing cocaine from Rodriguez to sell to Richards. Indeed, the government identified this conversation in the PSI Report, but Melendez objected to it only summarily below and never reckoned with it on appeal. Melendez's communications also appear to discuss what could have been an additional cocaine purchase from Cordova on April 13.

Given these facts, it is plausible that Melendez sold cocaine on April 22 that came from sources other than Cordova. On this record, we cannot say that the district court clearly erred — let alone committed plain error — by concluding that the two scenarios involved different sources of cocaine. See Kinsella, 622 F.3d at 86 ("[W]hen the record supports more than one estimate, the judge's selection 'from among plausible alternatives cannot be

---

[6] Although Melendez objected that the 500 grams attributed to him from the April 12 Cordova purchase involved double counting, the objection cited a paragraph of the PSI Report that discussed a transaction on April 3. Because Melendez did not argue below that the April 22 Richards sale involved cocaine from the April 12 Cordova purchase, this claim of double counting is unpreserved, and our review is for plain error. See Duarte, 246 F.3d at 60.

clearly erroneous.'" (quoting United States v. Morillo, 8 F.3d 864, 871 (1st Cir. 1993))).

That ends this aspect of the matter. Even if Melendez prevailed on all his other claims, the total drug quantity would decrease only by 542 grams. The total amount of cocaine would then become 3,658 grams — an amount that is still above the 3.5-kilogram threshold needed to bring into play a base offense level of twenty-eight. See USSG §2D1.1(c)(6). Accordingly, any error — if one occurred — would be harmless because it would not affect the total offense level. See United States v. Rivera Calderón, 578 F.3d 78, 105 (1st Cir. 2009) (holding that "error was harmless because the court's other findings were accurate and qualified [defendant] for the offense level assigned").

## C

Melendez next asserts that the court clearly erred by imposing a four-level "organizer or leader" enhancement.[7] He contends that it was a mischaracterization to suggest that he had organized or led a "drug trafficking organization" when the evidence showed only that a small group, over a short period of

---

[7] Melendez also challenges an enhancement to his sentence for the robbery offense. But he mounts that challenge only in a footnote and makes no developed argumentation in support of it. We thus deem the challenge waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

time, occasionally collaborated to buy and sell relatively modest quantities of cocaine.[8] He adds that the court failed to explain why Rodriguez did not receive the same enhancement when neither of the defendants had authority over the other and they maintained joint responsibility for any assets. See United States v. Walker, 89 F.4th 173, 186 (1st Cir. 2023) ("The lack of any explanation for the district court's decision gives us special pause here because it is not apparent from the record that the court performed the inquiry required by the . . . [g]uideline.").

We agree that the evidence does not suffice to show that Melendez was the leader of the conspiracy. The evidence, however, supports the conclusion that Melendez was an organizer of the conspiracy, and that the district court did not overstep its bounds by treating him as such. Because one's status as an "organizer" is an inherently fact specific determination, our review of this finding is for clear error. See Rostoff, 53 F.3d at 413. One's status as an "organizer" depends on factors such as his exercise of decision-making authority; the nature of his

---

[8] This passing description of the events is the only possible reference that challenges the scope requirement. Thus, Melendez has waived any argument that the government has not satisfied this requirement. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). And in all events, the conspiracy clearly involved at least five participants (Melendez, Rodriguez, Mack, Jean, and Cordova), which would in itself be sufficient to satisfy the scope requirement. See Rivera, 51 F.4th at 51.

participation in the criminal activity; whether he recruited accomplices; whether he was entitled to more of the proceeds; to what extent he planned or organized the criminal activity; and how much control or authority he had over other participants. See USSG §3B1.1, cmt. n.4. Here, the facts plausibly support an inference that Melendez acted as an organizer.

There is evidence that Melendez planned the criminal activity, structured the deals, received the proceeds, engaged in recruitment, and coordinated the activities of various henchmen. Although Melendez may have only arranged transactions with other associates — rather than supervise their activities — "[o]ne may be classified as an organizer, though perhaps not as a leader, if he coordinates others so as to facilitate the commission of criminal activity." Tejada-Beltran, 50 F.3d at 112.

To be sure, the government acknowledged that other participants played substantial roles in the conspiracy. For example, Rodriguez's residence was "the hub of their drug operation." And his "role was to ensure the security of the assets" and "the security of the drugs that they [were] . . . acquiring and/or distributing." Moreover, it is apparent that Melendez had no authority over Cordova or Richards. Cordova independently contacted Melendez when he had cocaine to sell, and Richards independently contacted Melendez when he wished

to purchase cocaine (although Melendez on occasion would advise Richards when he had cocaine available for sale).

Even so, Melendez's argument overstates the authority over an operation that the guidelines require in order to ground "organizer" status.  Although Rodriguez also played a significant role in the conspiracy, "a defendant need not exercise complete hegemony over the entire criminal enterprise in order to qualify as an organizer."  United States v. Ilarraza, 963 F.3d 1, 14 (1st Cir. 2020).  After all, "more than one person [can] qualif[y] as a leader or organizer of a criminal association or conspiracy." USSG §3B1.1, cmt. n.4; see Ilarraza, 963 F.3d at 14.  Because these facts adequately buttress the district court's application of the enhancement, we reject Melendez's claim of error.

## VI

We need go no further.  For the reasons elucidated above, the judgment of the district court is


**Affirmed**.